**2023 UT 3**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Respondent,*

*v.*

GREGORY RYAN MILLER,
*Petitioner.*

No. 20210617
Heard September 1, 2022
Filed March 16, 2023

On Certiorari to the Utah Court of Appeals

Third District, West Jordan
The Honorable Bruce C. Lubeck
The Honorable A. Chelsea Koch
No. 151400888

Attorneys:

Simarjit S. Gill, Breanne M. Miller, Salt Lake City, for respondent

Nathalie S. Skibine, Salt Lake City, for petitioner

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the Court in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN, JUSTICE POHLMAN, and JUDGE PETTIT joined.

Having recused herself, JUSTICE HAGEN does not participate herein; DISTRICT COURT JUDGE KARA L. PETTIT sat.

JUSTICE PEARCE, opinion of the Court:

### INTRODUCTION

¶ 1  A jury convicted Gregory Miller of stalking Kendra, a former friend and coworker.[1] The conviction rested, in large part, on emails that Miller sent to an attorney who represented Kendra and his

---

[1] Kendra is a pseudonym.

former—and Kendra's then-current—employer. The district court judge who presided over the trial arrested the judgment, concluding that no reasonable jury could have convicted Miller of stalking based on those emails. The State appealed, and the court of appeals reversed. After some wrangling to ensure that appellate jurisdiction existed, we granted certiorari.

¶ 2   Miller nevertheless contends that we lack jurisdiction. The State initially appealed the arrest of judgment from a non-final order. Miller argues that Utah Rule of Appellate Procedure 4(c)—which allows the appeal of a non-final order to be effective upon the entry of a final order—does not apply to this appeal. Miller claims that the years-long delay between the announcement of the non-final order and the entry of the final order, as well as the fact that a different judge entered the final order, pulls this case out of rule 4(c)'s reach.

¶ 3   As for the substance of the court of appeals' decision, Miller argues that the court of appeals misinterpreted the statute when it held Miller could be guilty of stalking Kendra without the State proving that Miller knew or should have known that the emails he sent to the attorney who represented Kendra and her employer would be shared with Kendra. Miller further claims that there was insufficient evidence for the jury to conclude that he caused Kendra to suffer the emotional distress the statute requires.

¶ 4   We have jurisdiction. The court of appeals did not err when it interpreted the stalking statute. And when we indulge the inferences in favor of the verdict, there was sufficient evidence to sustain Miller's conviction. We affirm.

## BACKGROUND

¶ 5 Gregory Miller met Kendra at work in 2003 or 2004 and began a friendship.[2] In 2011, Miller helped Kendra obtain an interview with his new employer, and soon they were again working

---

[2] When we review the court of appeals' opinion dealing with a district court's decision to arrest judgment, we recite the facts in the light most favorable to the jury's verdict. *See State v. Stricklan*, 2020 UT 65, ¶¶ 2–3 n.1, 477 P.3d 1251. We also present conflicting evidence as necessary to understand issues raised on appeal. *State v. Heaps*, 2000 UT 5, ¶ 2, 999 P.2d 565. We have taken the facts here from—among other record sources—the testimony Kendra and Miller provided at trial.

at the same company. According to Miller, there were good times and there were bad times during their friendship. The summer of 2012 was a bad time.

¶ 6 That summer, Miller found an invoice at work from a law firm for legal research into whether convicted felons can own an interest in a security system company. This invoice revealed that the then-owner of the company where Miller worked had been convicted of a felony. Miller concluded that the company was operating illegally and confronted the owner. The company fired Miller.

¶ 7 A week later, the company offered Miller a proposed severance agreement. After a bit of back and forth, the company abruptly stopped negotiating. Miller testified that the company changed its approach because Kendra had given the company damaging information about him.

¶ 8 Shortly after Miller was fired, Kendra informed him that she no longer wanted any contact with him. Miller kept contacting her, both at home and at work, to discuss personal and work issues. He asked Kendra to be a positive work reference for him and suggested that, in exchange, Kendra could take time to find employment elsewhere before he contacted the authorities to have the company shut down.

¶ 9 In some of these communications, Miller used a variety of racial slurs to refer to Kendra's boyfriend. Miller also asked Kendra if he could meet her boyfriend. Kendra again asked Miller to stop contacting her.

¶ 10  In August 2013, Kendra obtained a civil stalking injunction against Miller. The injunction warned Miller not to contact either Kendra or Kendra's daughters "directly or indirectly" and to stay away from Kendra's home and work. After the injunction was issued, Miller stopped directly calling, texting, or emailing Kendra.

¶ 11  Miller filed complaints about the company with several regulatory agencies in the summer of 2013. The company filed a lawsuit against Miller. Sometime before August 2014, the company and Miller reached a settlement agreement.

¶ 12  The truce was short-lived. On August 11, 2014, Miller emailed the company's outside counsel, who also represented Kendra. This commenced the email chain at the center of this case.

¶ 13  Miller's email to the attorney had the subject line "cutting connective tissue." Miller wrote the attorney that he believed "issues

pertaining to" complaints filed against the company with the Utah Division of Occupational and Professional Licensing were not covered by the settlement agreement and suggested that he could reference these complaints as part of a separate civil suit against the Division and the FBI.

¶ 14 Miller also informed the attorney that he had a job interview with one of the company's competitors. Miller told the attorney that he was planning on working with Utah legislators to "improve Utah's regulation of companies trafficking in sensitive consumer information." Miller stated that he did not see these actions as a breach of his settlement agreement, but that if the settlement agreement "could be construed to require a signer to offer advance notice of actions that might affect any other signer, I hereby offer such notice."

¶ 15 On August 12, the attorney replied that the actions Miller described in his email would indeed breach the settlement agreement.

¶ 16 Miller responded later that day and asked if the settlement agreement would be considered ineffectual. Miller also took the occasion to accuse Kendra and the company's owner of making up stalking charges against him. Miller also suggested that the owner was using Kendra's stalking allegations to take revenge on Miller.

¶ 17 The company's attorney began his August 13 response: "I will not engage in further dialogue with you about these issues."

¶ 18 The next day, Miller proposed a new settlement agreement. One of Miller's proposed terms was:

> Gregory Ryan Miller . . . [e]nters into a formal agreement with [the company] to refrain from pressing criminal charges or bringing civil actions against any related party, including [the owner] and [Kendra], for actions and statements alleged to have occurred prior to the date of signing of said formal agreement.

¶ 19 Less than an hour and a half later, the attorney responded: "Your offer is rejected."

¶ 20 Miller replied suggesting that the company re-employ him as a "Strategic Consultant" and give him a six-figure salary and signing bonus. Miller also proposed:

> [The company] pays to $zero balances the existing delinquent federal and state tax liabilities of [Kendra];

> [The company] establishes a fund for $25,000.00 to reimburse the tuition and other post-secondary educational expenses of [one of Kendra's daughters].

¶ 21 Within fifteen minutes, the attorney responded: "Your offer is rejected."

¶ 22 Miller's reply, on August 20, did not offer new settlement terms. He again suggested the owner was using Kendra to harm his career and reputation. Miller also said he would wait until the end of the week to receive a "good faith and workable solution."

¶ 23 The attorney wrote back on August 21 and expressed that the company had hoped that entering into the settlement agreement meant that the company's conflicts with Miller "would be a thing of the past," and they continued to "hope that is true."

¶ 24 Miller's response, on August 22, suggested he again found the original settlement agreement unworkable and believed a court would side with him. He signed off with: "End of day approaches. Kindly present an offer."

¶ 25 The attorney responded the same day, asking Miller: "[I]f we were to indulge you and begin negotiations anew . . . what guarantee would we have that you would abide by THAT agreement . . . ?"

¶ 26 On August 25, Miller provided reasons he would follow his newly suggested terms, including:

> [B]efore me is a once-in-a-lifetime and priceless opportunity to repay evil with good. In my estimation [Kendra] has been treacherous, ungrateful, thoughtless and vicious. She has caused tremendous harm to me and mine, such that instinct and worldly wisdom tell me to hate and humiliate her. But who would gain from this? Instead, it is my hope that to give up some of my advantage in order to ease her burden would serve to brighten her outlook, soften her disposition and perhaps even help her to escape the cycle of futility, despair and vice that has plagued her for many years.

¶ 27 The company attorney forwarded these messages to the company's owner and the company's in-house counsel. Kendra heard about these emails, which were later forwarded to the police.

¶ 28   The State charged Miller with three counts of stalking. The first count accused Miller of violating the stalking statute based on his contact with Kendra between August 2012 and August 2013—when Kendra obtained the stalking injunction. The second accused Miller of violating the stalking injunction when he shopped at a Harmons grocery store at the same time Kendra was there. The third accused Miller of violating the stalking statute and the injunction when he sent the emails to the company's attorney.[3]

¶ 29   At trial, Kendra outlined how Miller's persistent efforts to be part of her life were part of what motivated her to seek a stalking injunction. She told the jury that after Miller was fired, but before she obtained the injunction, Miller consistently contacted her and offered to buy her gifts or give her money to encourage her to talk to him.

¶ 30   Kendra testified that, before she obtained the injunction, Miller sent her a message stating:

> In fact, as a show of good faith, I will buy you a Harmons gift card. Ask for it next Friday at the checkout station typically manned by the older red-headed woman. If it's not there, then they don't sell them. I need a shirt. Tomorrow at 3 I will be at Macy's to buy it. I might even be in a generous mood.

¶ 31   Kendra recounted that she rejected the gift card. She testified: "I wouldn't accept it. I just said no, I want—because that's where I get my lunch most days, and I just said no, I don't want this."

¶ 32   Kendra testified that, with these offers, Miller "was trying to buy me things. He was—he thought maybe if he gave me money I would talk to him."

---

[3] We, like the court of appeals, cite to the version of the stalking statute from 2014, the year Miller sent the emails that form the basis of his conviction. *State v. Miller*, 2021 UT App 88, ¶ 19, 496 P.3d 282. Miller cites the 2012 statute, but he does not explain why he chose that version. Nor does he argue that the court of appeals erred in examining the 2014 version. Because there are no material differences between the 2012 and 2014 versions, we elect to cite to the 2014 statute to be consistent with the court of appeals.

¶ 33   Kendra also testified that Miller messaged her asking for a good job reference in exchange for helping Kendra find a job. He emailed Kendra and told her:

> Agree to help me with a good reference and I'll wait until March to contact the authorities. This will give you ample time to find a new job. I'll even help you in any way that I can, otherwise I'll send off the emails and documents [to the authorities] next week.

¶ 34   In a subsequent phone call—but before Kendra obtained the stalking injunction—Miller again asked Kendra for a job reference. The jury heard a snippet of this call, where Miller told Kendra that he lied to get her a job, that he "inflated things on [her] behalf," and that he "created that job and put [her] in it."

¶ 35   The jury also heard a recording of Miller telling Kendra: "[T]here's a pretty good chance I'll be able to create a position for you if you need it or want it. Um, obviously before that there's a few things we'd have to sit down and work out."

¶ 36   The State played another message for the jury in which Miller told Kendra: "I will legitimately reconsider my offer to, you know, throw a reasonable amount of money for your—your tax debts if you'll [inaudible] sit down with me and try to sort through, um, [inaudible], the source of the contention."

¶ 37   On cross-examination, Kendra testified that she did not want Miller's gifts or job offers. She testified: "I don't want a job offer. I don't want presents. I don't want gifts. I don't want money. I wanted him to leave me alone."

¶ 38   After Kendra obtained the injunction, Miller did not directly contact her. But Kendra testified about learning that Miller had written about her in his post-injunction emails with the attorney and the effect that had on her. Kendra said: "[I]t was a constant. . . . I had to hear how, um, I was being brought up. I was showed [sic] papers where he was demanding the company pay me money. Then he demanded the company pay my daughter money."

¶ 39   Kendra found these emails "very disruptive." She stated:

> I couldn't concentrate on my job. You know, having feel—you know, knowing that people are talking about me, not knowing what, you know, was saying [sic] because I do not see what things he says about me. Um, I was feeling, you know, anxious, horrible. I was just—I was worried. I didn't know what was going on."

¶ 40 About Miller's pre- and post-injunction behavior, Kendra testified:

> It was one of the worst things I've ever been through. It was horrible. I felt bullied. I felt—I mean, I just—it was a really rough time. I mean, there was probably a year that I had my phone at work called constantly. I mean, it was—I couldn't escape work. I couldn't—I felt like I was being followed. I felt like I—it was horrible. It was very emotional, very stressful, very—I would get angry. I would go through all the emotions. It was—and it was—you know, I felt helpless. I thought there was nothing anybody was going to ever do to ever stop him.

¶ 41 The State's third count was based on the emails. The State proffered two theories of guilt. The first was that Miller violated the stalking statute by participating in a course of conduct that he knew or should have known would cause Kendra emotional distress. The second was that Miller "intentionally or knowingly violated a valid stalking injunction" when he sent the emails.

¶ 42 The jury acquitted Miller of two counts of stalking but convicted him on the third count. The jury was not asked to reveal which theory of guilt it used to convict Miller.

¶ 43 Miller moved the district court to arrest the jury verdict. The district court granted the motion in an oral ruling. The district court reasoned that, given "the way [Miller's emails were] structured through the attorney[,] . . . there is just no reasonable basis on which to believe [Miller] could think . . . or intend that that was going to cause [Kendra] or did cause her emotional distress or any fear." The district court asked the defendant to prepare a written order reflecting the court's findings and decision. But it appears from the record that neither the defendant nor the State ever did.

¶ 44 The State appealed the oral order. The State primarily argued that the district court erred because there was sufficient evidence for the jury to convict Miller of participating in a course of conduct that qualified as stalking under the statute. The State also contended that there was sufficient evidence to permit the jury to find that Miller had violated the stalking injunction. The court of appeals reversed. *State v. Miller*, 2021 UT App 88, ¶ 1, 496 P.3d 282. The court determined that "the State presented sufficient evidence from which a reasonable jury could find that, at the time that Miller

sent the emails, he knew or should have known that a reasonable person in [Kendra's] circumstances would suffer significant mental or psychological suffering." *Id.* ¶ 23.

¶ 45 Because it concluded that there was sufficient evidence to permit a jury to infer that Miller's conduct could have caused a reasonable person emotional distress, the court of appeals declined to determine whether the emails constituted behavior that would violate the stalking injunction. *Id.* ¶ 19 n.3.

¶ 46 Miller sought certiorari review, which this court granted. Miller then filed a petition noting that the district court had never entered a final order. We vacated the court of appeals' opinion and remanded to allow the parties to seek entry of a final order. In May 2020, the district court entered a written order.

¶ 47 In October 2020, the State moved the court of appeals to reinstate its vacated opinion. The court of appeals denied that motion. The court of appeals instead issued a new opinion almost identical to the one we had vacated. *See id.* ¶ 1 n.* (referencing *State v. Miller*, 2019 UT App 46, 440 P.3d 868, *vacated by court order*). Miller again petitioned for a writ of certiorari.

## ISSUES AND STANDARDS OF REVIEW

¶ 48 Miller first contends that we lack jurisdiction over this matter. "Whether this court has jurisdiction over an appeal is a question of law . . . ." *In re Adoption of A.B.*, 2010 UT 55, ¶ 21, 245 P.3d 711.

¶ 49 Miller next contends that the court of appeals erred when it overturned the district court's decision to arrest judgment. We review the court of appeals' decision to reverse the arrest of judgment for correctness, "focusing on whether that court correctly reviewed the trial court's decision under the appropriate standard of review." *Drew v. Pac. Life Ins. Co.*, 2021 UT 55, ¶ 34, 496 P.3d 201 (cleaned up). In other words, when we review a "court of appeals' decision, we apply the same standard of review that [we] would apply in reviewing the decision of the district court." *Id.* (cleaned up).

¶ 50 "We review a district court's grant or denial of a motion for directed verdict and to arrest judgment for correctness," and we "uphold a denial of the motion for directed verdict [or to arrest judgment] based on an insufficiency of the evidence claim, if . . . some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable

doubt." *State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251 (cleaned up). Thus, we "reverse the denial of a motion to arrest judgment only if the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *Id.* ¶ 31 (cleaned up).

## ANALYSIS

### I. UTAH RULE OF APPELLATE PROCEDURE 4(C) APPLIES TO THE STATE'S PREMATURE APPEAL

¶ 51   Miller argues that we do not have jurisdiction because the State did not file a timely appeal. As we noted when we denied the State's first petition for certiorari, the State appealed from a non-final oral ruling. Our appellate jurisdiction over this dispute would have been triggered by a final order, which we did not have. So we vacated the court of appeals' first opinion and remanded the case to the court of appeals to allow the district court to enter a final order.

¶ 52   Utah Rule of Appellate Procedure 4(c) provides that "[a] notice of appeal filed after the announcement of a decision, judgment, or order but before entry of the judgment or order shall be treated as filed after such entry and on the day thereof." UTAH R. APP. P. 4(c). By its plain language, rule 4(c) applies to save the State's premature appeal. Miller contends, however, that rule 4(c) does not apply to the State's notice of appeal. He argues the rule does not apply because the final order was entered three years after the district court announced its decision—by a different district court and based upon a new set of filings.

¶ 53   Miller has something of a point. Rule 4(c) contemplates that the judgment or order be the document that finalizes the "announcement of a decision, judgment, or order" that the party prematurely appealed from. And Miller points to some factors—the passage of time, consideration of different materials, entry by a different judge—that in some cases might suggest that the document that is ultimately entered is not actually the finalization of the earlier "announcement of the decision, judgment, or order."

¶ 54   The problem for Miller is that there is no doubt here that the order entered three years after the announcement of the decision

was the finalization of the district court's oral ruling that was the basis of the State's oversoon notice of appeal.[4]

¶ 55  The district court judge who finalized the order wrote: "It should be noted that this court did not hear the trial or the argument on the motions. . . . On remand, this court is attempting to interpret the basis of Judge Lubeck's order from the transcript of the hearing."

¶ 56  Moreover, when Miller raised the jurisdictional concern and this court remanded to the court of appeals, we stated that "it appears [4(c)] still would continue to preserve the Court of Appeals' ability to adjudicate an appeal upon the issuance of a final order by the district court if the matter is remanded to the Court of Appeals." We remanded, anticipating "the entry of a final order in the district court."

¶ 57  For these reasons, we can readily conclude that the order entered on remand embodied the ruling from which the State attempted to appeal. This is the scenario rule 4(c) contemplates. The appeal is timely, and we have jurisdiction.

¶ 58  Miller also contends that the State failed to make the final order part of the record and that, without that order in the record, we lack jurisdiction. Again, there is a rule for that. Utah Rule of Appellate Procedure 11(f) allows the parties to stipulate to—or a party to move to—supplement the record.[5] The State moved to

---

[4] Miller argues this court's strict interpretation of the thirty-day deadline to file an appeal in Utah Rule of Appellate Procedure 4(a) means that "[w]hen a notice of appeal is over three years premature, the notice of appeal does not fall within the safe harbor" of 4(c). Miller cites nothing in the Utah Rules of Appellate Procedure to support this contention. And we see nothing in those rules to help him either. Unlike rule 4(a), rule 4(c) has no express time limitation.

[5] The rule states:

> If anything material to either party is omitted from or misstated in the record by error of the trial court or court personnel, by accident, or because the appellant did not order a transcript of proceedings that the appellee needs to respond to issues raised in the appellant's brief, the omission or misstatement may be corrected and a supplemental record may be created and forwarded:

(continued . . .)

11

supplement. We grant the motion because the final order was attached to both briefs and there is no factual dispute about what the order is or says.

## II. THE COURT OF APPEALS CORRECTLY INTERPRETED THE STALKING STATUTE

¶ 59 Miller's merits arguments can be divided into two categories. In the first batch of arguments, Miller avers that the court of appeals erred in its interpretation of the stalking statute. The second group attacks the court of appeals' conclusion that the State introduced sufficient evidence of Miller's guilt such that the district court erred when it arrested judgment.

¶ 60 Miller first argues that the court of appeals misinterpreted the statute when it concluded that the statute did not require that Miller knew or should have known his emails would reach Kendra. Miller next argues that the court of appeals erred when it interpreted the statute because its interpretation raises constitutional issues. Miller last contends that the court of appeals' statutory interpretation improperly expanded the range of behaviors that could be considered stalking under Utah law.

*A. The Court of Appeals Correctly Interpreted the Stalking Statute when It Held that the Statute Does Not Always Require that a Defendant Know His Conduct Will Actually Reach the Intended Victim of that Conduct*

¶ 61 Miller first argues that the court of appeals misinterpreted the statute because it held that the statute's requirement—a person "knows or should know" their actions would cause emotional distress—does not require the State to prove someone "knows or should know" their actions will reach the intended victim.

¶ 62 The court of appeals held: "The statute does not require that the perpetrator intend for his message to reach the victim through the victim's employer or co-workers." *State v. Miller*, 2021 UT App 88, ¶ 20, 496 P.3d 282.

¶ 63 The statute specifies that a person commits the crime of stalking if the person:

---

    (A) on stipulation of the parties;
    (B) by the trial court before or after the record has been forwarded; or
    (C) by the appellate court on a motion from a party.
UTAH R. APP. P. 11(f)(2).

 (2) [I]ntentionally or knowingly engages in a course of conduct directed at a specific person and knows or should know that the course of conduct would cause a reasonable person:

  (a) to fear for the person's own safety or the safety of a third person; or

  (b) to suffer other emotional distress.

UTAH CODE § 76-5-106.5(2) (2014).[6]

¶ 64 Emotional distress "means significant mental or psychological suffering, whether or not medical or other professional treatment or counseling is required." *Id.* § 76-5-106.5(1)(d).

¶ 65 The court's goal in statutory interpretation "is to ascertain the intent of the legislature," the best evidence of which "is the plain language of the statute itself." *Castro v. Lemus*, 2019 UT 71, ¶ 17, 456 P.3d 750 (cleaned up).

¶ 66 Miller's argument turns on what the court of appeals meant when it held that the perpetrator need not intend the conduct "reach" the victim. If the court of appeals meant by "reach" that a victim need not feel the effects of a course of conduct, that would be a misreading of the statute. But that is not how we understand the court of appeals' opinion. By "reach," the court of appeals meant that a victim need not necessarily know that the defendant's course of conduct is the source of the emotional distress they are experiencing. And that reading comports with the statute's plain language.

¶ 67 To commit stalking, the defendant must know or should know his course of conduct would cause a reasonable person to

---

[6] A person can also be guilty of stalking if they violate a criminal or civil stalking injunction. UTAH CODE § 76-5-106.5(3) (2014). In addition to his claim of insufficient evidence for violating the stalking statute based on a course of conduct that would cause emotional distress, Miller asks us to hold that there was insufficient evidence that his emails violated the injunction. Since we affirm the court of appeals' holding that there was sufficient evidence to convict Miller on the State's theory that he engaged in a course of conduct that caused Kendra emotional distress, we do not need to determine if he also violated the injunction.

suffer emotional distress. That articulation leaves open the possibility that a defendant commits stalking when the defendant knows or should know that the intended victim will be affected by the course of conduct—in the form of emotional distress—even if the intended victim is unaware of the defendant's actions.

¶ 68   To be clear, in many cases, to prove stalking, the State will need to introduce proof that the defendant knew or should have known that the intended victim would be aware of the conduct. But that will depend on the facts of the individual case.

¶ 69   The following example illustrates one way someone could experience emotional distress without knowing about a specific course of conduct. Patrick crafts a plan to make Gary miserable. Patrick sends several anonymous letters to Gary's spouse. The letters claim that Gary is cheating on his spouse. Patrick knows Gary and his spouse well enough to know that Gary's spouse will never tell Gary about the letters. But Patrick also knows that the letters will change the way Gary's spouse interacts with him and that the spouse will begin alienating Gary. And indeed, Gary's spouse begins to mistreat Gary, causing him emotional distress.

¶ 70   By its plain language, the statute would not require the State to prove that Patrick knew or should have known that Gary would receive the letters or that the letters would be shared with him. The statute only requires that the State prove Patrick "know[] or should know" that his "course of conduct" directed at Gary would "cause a reasonable person" in Gary's circumstances to "suffer . . . emotional distress." UTAH CODE § 76-5-106.5(2) (2014). On this fact pattern, the State might be able to establish that a reasonable person in Gary's shoes would suffer emotional distress without becoming aware of the letters Patrick sent.

¶ 71   The court of appeals interpreted the statute consistent with its plain language. The statute did not require the State to prove that Miller knew or should have known that Kendra would learn that he had sent emails to the attorney. The statute required that the State prove that Miller directed the content of his emails at Kendra and that Miller knew or should have known that sending the emails to the attorney would cause emotional distress to a reasonable person in Kendra's circumstances.

### B. Miller Has Not Demonstrated that the Court of Appeals' Interpretation Is Unconstitutional

¶ 72  Miller next argues that the court of appeals interpreted the statute in an unconstitutional fashion. Miller contends that the court of appeals, in line with our precedent, interpreted the statute to make it "a crime to communicate about a person, regardless of whether the person hears about the communication." Miller argues that this interpretation raises "First Amendment concerns" and potentially makes the statute unconstitutionally overbroad.

¶ 73  Although Miller raises the specter of unconstitutionality, he concedes that his "case is not directly about a constitutional challenge to the stalking statute." Likewise, Miller never argues that the statute, either on its face or as applied to him, violates his rights.

¶ 74 Miller instead argues that the court of appeals' interpretation raises First Amendment concerns because it may be overly broad.[7] Miller contends that these concerns "counsel against an overbroad construction of our criminal laws." (Quoting *State v. Bagnes*, 2014 UT 4, ¶ 35, 322 P.3d 719.) And he asks us to read the statute differently than the court of appeals did to avoid those constitutional concerns.

¶ 75  Although he does not call it by its name, Miller seems to invoke the canon of constitutional avoidance. That canon provides that when a court is presented with two plausible readings of a statute, and one raises constitutional concerns, the court should choose the interpretation that steers clear of the constitutional issues.

¶ 76  It is important to remember that this canon is "a means of giving effect to [legislative] intent, not of subverting it." *Utah Dep't of Transp. v. Carlson*, 2014 UT 24, ¶ 23, 332 P.3d 900 (cleaned up). "Constitutional avoidance rests on the reasonable presumption that where there is more than one plausible interpretation of a statute, the legislature did not intend the interpretation which raises serious constitutional doubts." *State v. Garcia*, 2017 UT 53, ¶ 59, 424 P.3d 171 (cleaned up). We employ the canon to give effect to the law, but we

---

[7] A statute may be struck for overbreadth if a petitioner successfully argues "(1) the statute reaches a substantial amount of constitutionally protected conduct . . . and (2) the statute is not readily subject to a narrowing construction." *Provo City Corp. v. Thompson*, 2004 UT 14, ¶ 11, 86 P.3d 735 (cleaned up).

do not use it to write a law different from the one the Legislature passed. "Even when we are trying to save a statute from constitutional concerns, we are not at liberty to rewrite the statute or to inject the statute with our policy judgments. Our job is to interpret the statute as the legislature wrote it." *Id.*

¶ 77   It is not enough for a party to spot a lurking constitutional issue. We have noted that the "mere presence of potential constitutional issues does not trigger the canon of constitutional avoidance." *State v. Hatfield*, 2020 UT 1, ¶ 39, 462 P.3d 330. Rather, a party seeking to invoke the canon must show that "the statute [is] genuinely susceptible to two constructions." *Carlson*, 2014 UT 24, ¶ 24 (cleaned up). Because "[o]ur job is to interpret the statute as the legislature wrote it," a party who cannot point to a plausible interpretation of the text cannot invoke the doctrine of constitutional avoidance. *See Garcia*, 2017 UT 53, ¶ 59. In that case, the party would need to challenge the statue as unconstitutional. *See Carlson*, 2014 UT 24, ¶¶ 24–25.

¶ 78   *State v. Garcia* provides an example of this canon in action. In *Garcia,* we were asked to interpret the phrase "unlawful user" in the definition of "unlawful user of a controlled substance." *Garcia,.* 2017 UT 53, ¶ 54 (quoting UTAH CODE §§ 76-10-503(1)(b)(iii)*,* 58-37-2(1)(ii)*,* 58-37-4(2)(b)(i)(D)). Garcia argued that the phrase "unlawful user" was open to various interpretations and that the statute would be unconstitutionally vague without a narrow interpretation from this court. *Id.*

¶ 79   Garcia offered two different interpretations of the phrase "unlawful user." *Id.*   ¶ 58. We rejected Garcia's preferred interpretation because it strayed from the text. *Id.*   ¶¶ 59–60. We opined that to read the statute the way Garcia preferred "would require us to rewrite the statute to include a concept of contemporaneous use [of firearms and substances] that the plain text does not require and is not necessary to preserve the statute's constitutionality." *Id.*   ¶ 60. We chose Garcia's other proffered interpretation because it both adhered to the statute's text and avoided the constitutional vagueness concern. *Id.* ¶ 61.

¶ 80   Miller may ultimately have an argument about the breadth of the stalking statute. He certainly cites to other courts that have identified First Amendment problems with their jurisdictions' stalking statutes. *See People v. Relerford*, 104 N.E.3d 341, 349–51 (Ill. 2017); *State v. Shackelford*, 825 S.E.2d 689, 699 (N.C. Ct. App. 2019). But what Miller has not done is proffer an interpretation of the

statute that both adheres to the text and avoids the constitutional problem. Nor has he directly challenged the statute's constitutionality. Without one or the other, we cannot use the looming shadow of constitutional issues to vary the outcome the text requires.

### C. The Court of Appeals Correctly Interpreted the Statute to Permit the State to Point to a Broad Range of Behaviors that Could Cause Emotional Distress

¶ 81 Miller next claims the court of appeals misinterpreted the statute because it incorrectly "broadened the conduct that could be considered to cause significant mental or psychological suffering." Miller argues the court of appeals did this in two ways.

¶ 82 Miller first claims the court of appeals erred when it interpreted the statute to consider behavior that was not listed in *Baird v. Baird,* 2014 UT 08, 322 P.3d 728. In *Baird,* we examined statutory language that required that the course of conduct be something that would cause "a reasonable person" emotional distress. *See id.* ¶¶ 23–26. We noted the statute defines "reasonable person" as "a reasonable person in the victim's circumstances." *Id.* ¶ 23 (quoting UTAH CODE § 76-5-106.5(1)(e)). We explained that, "[b]y including 'in the victim's circumstances' as part of the 'reasonable person' definition, the Stalking Statute provides for an individualized objective standard." *Id.* ¶ 26.

¶ 83 We then proceeded to list several factors to which a trier of fact might look to assess whether the course of conduct would cause emotional distress to a reasonable person in the victim's circumstances. *Id.* ¶ 27. We mentioned, as relevant considerations, the "victim's background, the victim's knowledge of and relationship with the defendant, any history of abuse between the parties, the location of the alleged stalking and its proximity to the victim's children, if any, and the cumulative effect of defendant's repetitive conduct." *Id.* (cleaned up).

¶ 84 The court of appeals here followed our lead and provided some additional examples of behavior—not listed in *Baird*—that might inflict emotional distress. *Miller*, 2021 UT App 88, ¶ 22. This included behavior that might cause "[d]amage to one's reputation, relationships, or livelihood." *Id.*[8]

---

[8] The court of appeals quoted the National Center for Victims of Crime on other behavior that might inflict emotional distress, which

(continued . . .)

¶ 85 Miller argues that this impermissibly extended the stalking statute's reach. We disagree. *Baird* itself made clear that the factors it outlined were just a list of factors that "[c]ourts applying this individualized objective standard have considered." *Baird*, 2014 UT 8, ¶ 27. Nowhere in *Baird* did we suggest that we intended to provide an exhaustive list of relevant factors.

¶ 86 Moreover, the factors the court of appeals referenced are entirely appropriate as additional examples of behavior that could, in certain circumstances, cause a victim emotional distress. We see nothing wrong with the court of appeals adding to the examples we highlighted in *Baird.*

¶ 87 Miller next contends that the court of appeals failed to account for the context in which his conduct occurred: contentious litigation. He argues that communications like those he engaged in with the company's attorney are commonplace in litigation and cannot form the basis of a stalking claim.

¶ 88 Miller argues that in circumstances where "the potential for emotional distress is so omnipresent[,] . . . criminal or civil liability should lie only in the most extreme of circumstances." (Quoting *Allen v. Anger*, 2011 UT App 19, ¶ 20, 248 P.3d 1001.)

¶ 89 Miller points to *Meyer v. Aposhian* and *Allen v. Anger* to highlight that the court of appeals has recognized that certain contexts can be emotionally charged and that triers of fact should be careful to take that into account. *See Meyer v. Aposhian*, 2016 UT App 47, ¶ 22, 369 P.3d 1284; *Allen*, 2011 UT App 19, ¶ 20. Miller contends that, in his case, the court of appeals should have relied on the logic of those cases and read the statute to carve out conduct related to contentious litigation in all but the most extreme circumstances.

¶ 90 *Meyer* and *Allen* are neither binding on our analysis nor particularly helpful to Miller's argument. In *Meyer,* for example, the court of appeals opined that when a trier of fact assesses whether a defendant's course of conduct has caused emotional distress, it

included "making repeated telephone calls to a victim at a workplace, possibly endangering her job, or engaging in conduct that destroys the victim's credit history." *Miller*, 2021 App 88, ¶ 22 (quoting National Center for Victims of Crime, *The Model Stalking Code Revisited: Responding to the New Realities of Stalking* 40 (2007), https://victimsofcrime.org/docs/default-source/src/model-stalking-code.pdf?sfvrsn=12 [https://perma.cc/Z5DS-2GAT]).

should consider the context in which the conduct occurred. *Meyer*, 2016 UT App 47, ¶ 22. The court noted that the fact finder must consider the "individualized objective standard" articulated in *Baird,* and therefore "must consider the entire context surrounding defendant's conduct." *Id.* (quoting *Baird,* 2014 UT 08, ¶ 26).

¶ 91  We agree with all of that. In fact, we said something similar in *Ragsdale v. Fishler,* 2021 UT 29, 491 P.3d 835. There, we emphasized that the statute requires the fact finder to take into account the victim's circumstances to determine whether a reasonable person in those circumstances would suffer emotional distress. We said:

> [A] petitioner need only show that the respondent's conduct would affect a reasonable person *in the petitioner's circumstances*. In applying this standard, courts must consider the entire context surrounding a respondent's conduct. They must consider the conduct cumulatively, accounting for the facts and circumstances of the individual case.

*Id.* ¶ 45 (cleaned up).

¶ 92 We further emphasized the importance of context, noting that "acts that seem perfectly innocent or even well intentioned may constitute stalking. For example, conduct such as sending the victim a dozen roses may seem benign and loving to the casual observer, but could mean a very different thing when understood in the context of the victim's experience." *Id.* (cleaned up). We recognize that the converse of this can also be true, that behavior that might seem egregious in some circumstances can be understood differently in certain contexts.

¶ 93 We agree with Miller that the context of behavior matters and that behavior undertaken in the context of contentious litigation might land differently than behavior occurring outside of a pitched legal battle. And we agree with Miller that the trier of fact should take that context into consideration when it determines if a reasonable person in the victim's shoes would suffer emotional distress. But to the extent Miller argues that the court of appeals erred because it did not recognize a *per se* rule that stalking cannot occur in the context of contentious litigation, we reject that argument.

¶ 94 The court of appeals did not err when it interpreted the statute.

## III. THE COURT OF APPEALS CORRECTLY HELD THAT SUFFICIENT EVIDENCE EXISTED FROM WHICH A REASONABLE JURY COULD FIND THAT MILLER KNEW OR SHOULD HAVE KNOWN HIS ACTIONS WOULD CAUSE KENDRA EMOTIONAL DISTRESS

¶ 95 Miller also claims that the court of appeals erred when it concluded that there was sufficient evidence for the jury to convict him.

¶ 96 After the jury reached its verdict, Miller asked the district court to arrest the judgment. A court can arrest judgment where "the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *State v. Workman*, 852 P.2d 981, 984 (Utah 1993).

¶ 97 The district court arrested the jury's verdict, finding that there was "no reasonable basis on which to believe" that Miller "could think . . . or intend" that his emails would cause a reasonable person in Kendra's shoes emotional distress. The court of appeals overturned the district court, holding that "the State presented sufficient evidence from which a reasonable jury could find that" Miller knew or should have known his emails would cause a person in Kendra's circumstances emotional distress. *State v. Miller*, 2021 UT App 88, ¶ 23, 496 P.3d 282.

¶ 98 Miller argues that the court of appeals erred because there was insufficient evidence to permit the jury to find that he knew or should have known his emails would cause a person in Kendra's circumstances emotional distress. He first contends that there was insufficient evidence of emotional distress such that a reasonable jury could not conclude that Miller knew or should have known that his course of conduct would cause a person in Kendra's circumstances emotional distress. He next argues that the court of appeals improperly considered evidence that supported counts on which the jury did not convict. He finally argues that the court of appeals erred when it failed to recognize that Miller's conduct would not cause a reasonable person in Kendra's circumstances emotional distress because she enjoyed the protection of an existing civil stalking protective order.

*A. The Court of Appeals Correctly Held that There Was Sufficient Evidence to Permit a Reasonable Jury to Find Miller Knew or Should Have Known His Conduct Would Cause a Person in Kendra's Circumstances Emotional Distress*

¶ 99 Miller argues the court of appeals incorrectly held there was sufficient evidence for a reasonable jury to find him guilty. Miller claims the evidence presented against him was insufficient in two ways: (1) the jury could not reasonably conclude that he knew or should have known that his conduct would cause a person in Kendra's circumstances emotional distress; and (2) the jury could not reasonably conclude that a person in the midst of contentious litigation would suffer emotional distress from emails like the ones he sent.

¶ 100 The court of appeals determined that "the State presented sufficient evidence from which a reasonable jury could find that, at the time that Miller sent the emails, he knew or should have known that a reasonable person in [Kendra's] circumstances would suffer significant mental or psychological suffering." *Miller*, 2021 UT App 88, ¶ 23. The court came to this conclusion based on Kendra's testimony "that she 'wanted nothing to do with' Miller or 'anything he was doing.'" *Id.* The court held there was sufficient evidence such that

> the jury could reasonably infer that Miller's emails were designed to damage [Kendra's] reputation and endanger her job and that Miller knew or should have known that such interference would cause a reasonable person, who had repeatedly requested that Miller leave her alone and had received a stalking injunction against him, to suffer emotional distress.

*Id.* ¶ 24.

¶ 101 Miller claims that the court of appeals erred because, without the State showing Miller knew his emails would reach Kendra, there could not have been sufficient evidence for a jury to find that he knew his emails would cause a person in Kendra's circumstances emotional distress. The court of appeals concluded that a "jury could reasonably find this element satisfied even if Miller had no reason to know that the emails would be relayed to [Kendra]." *Id.* ¶ 22. As discussed above, this accurately reads the statute: the test is not whether Miller knew (or should have known) the emails would reach Kendra, but whether Miller knew (or should

have known) the emails would cause a person in Kendra's circumstances emotional distress.

¶ 102 The jury could properly infer on this record that communicating to the company's lawyer about Kendra in this fashion would cause a person in Kendra's shoes emotional distress because it was a continuation of the type of behavior that caused her to seek a protective order.

¶ 103 As Miller himself points out, "regardless of whether Miller was not suing [Kendra] directly, she was involved in the lawsuit." A jury could reasonably conclude that Miller knew or should have known that, given Kendra's involvement in the lawsuit, the emails he sent to the attorney—who represented Kendra in addition to the company—would hurt Kendra. This is especially so where the emails referenced her, suggested that she and her daughter receive payments from the company, and called on her to release him from claims. A jury could reasonably conclude that on these facts, Miller should have known his emails would have an impact on Kendra.

¶ 104 Miller also argues that the court of appeals got it wrong because "there was insufficient evidence that any distress brought about by [the emails] . . . was more than the distress inherent in contentious litigation." Miller compares civil employment lawsuits to divorces and emancipation procedures, arguing that "[c]ivil employment lawsuits, like the one Miller was engaged in with his former employer, are like contentious divorces and emancipation procedures — 'by nature,' they 'cause emotional distress.'" (Quoting *Meyer v. Aposhian*, 2016 UT App 47, ¶ 16, 369 P.3d 1284.)

¶ 105 We take Miller's point that the State needed to put proof in front of the jury to demonstrate that it was Miller's course of conduct, directed at Kendra, and not just the contentious context in which that conduct occurred, that caused Kendra to suffer emotional distress. But we agree with the court of appeals that if we draw inferences from the evidence in favor of the verdict, the State met its burden, and the district court's decision to arrest judgment was erroneous.

¶ 106 When we view the evidence in a light most favorable to the verdict, Miller's conduct was not just litigation-related communications; it was a continuation of the pattern of behavior that motivated Kendra to seek a stalking injunction.

¶ 107 The jury heard that Miller had a history of offering gifts or money to Kendra to encourage her to talk with him. For example,

Miller offered Kendra a gift card to a Harmons grocery store "as a show of good faith." The jury heard Miller, in a phone message, tell Kendra, "I will legitimately reconsider my offer to, you know, throw a reasonable amount of money for your—your tax debts if you'll [inaudible] sit down with me and try to sort through, um, [inaudible], the source of the contention."

¶ 108 The jury heard Kendra testify that this distressed her. She stated: "I don't want a job offer. I don't want presents. I don't want gifts. I don't want money. I wanted him to leave me alone. For three, four or five years, that's all I have to say."

¶ 109 In light of this history, Miller asking the company to pay Kendra's debts and to establish a college fund for her daughter were more than just outlandish settlement offers; they were echoes of his past behavior that he knew troubled Kendra.

¶ 110 Similarly, the State introduced evidence that some of the behavior that caused Kendra to obtain a stalking injunction involved Miller alternatively promising her employment opportunities or threatening her employment. Miller had made comments indicating he had initially controlled her hiring and had leverage to eliminate her job. The jury heard a clip of Miller telling Kendra he "lied to get [her the] job," that he "inflated things on [her] behalf," and that he "created that job and put [her] in it." At trial, Kendra read an email from Miller telling her that he needed her to give him an employment reference, and if she didn't, he would send information to authorities that would cause the company to close and Kendra to lose her job.

¶ 111 Against this backdrop, a reasonable jury could conclude that Miller's emails to an attorney who represented Kendra and her employer were designed to continue the pattern of making Kendra feel that Miller was responsible for her employment and that her continued employment turned on how Miller felt about her. Miller wrote the attorney, stating: "In my estimation [Kendra] has been treacherous, ungrateful, thoughtless and vicious," but that it was Miller's hope that if he could "give up some of [his] advantage in order to ease her burden[,] [it] would serve to brighten her outlook, soften her disposition and perhaps even help her to escape the cycle of futility, despair and vice that has plagued her for many years."

¶ 112 Viewed in the light most favorable to the guilty verdict, this is sufficient to permit the jury to conclude that these emails

would cause a reasonable person in Kendra's circumstances emotional distress and that Miller knew or should have known it.[9]

### B. The Court of Appeals Correctly Held that the Jury Could Consider Evidence Presented Throughout the Trial

¶ 113 Miller argues there was insufficient evidence to convict him because "[t]he [jury] instructions specified that the conviction at issue was for the allegations about Miller's emails alone," and he was "acquitted on the counts related to his earlier conduct." Miller claims that, because "the State chose to charge Miller's earlier conduct [before the injunction] separately" from the conduct relating to the emails, the jury's acquittals on the first two counts means that any evidence relating to these counts should not impact our analysis of his guilt on the third.

¶ 114  The jury was instructed:

> Separate offenses charged in each count of this information, each charge of the offense and the evidence pertaining to it should be considered separately. The fact that you may find the defendant guilty or not guilty as to one count, is not to control your verdict as to any other count. Each count is to be considered separately.

¶ 115 The court of appeals did not directly address the issue of whether evidence from the trial that might pertain to charges one and two could also inform the jury's decision on count three. But it cited Kendra's testimony that she "'wanted nothing to do with'

---

[9] The court of appeals opined that this evidence would have caused a reasonable person to fear losing her job and that this fear would cause a reasonable person emotional distress. *Miller*, 2021 UT App 88, ¶ 22 (citing *State v. Askham*, 86 P.3d 1224, 1230 (Wash. Ct. App. 2004)). Miller attacks this conclusion and argues that there was no evidence before the jury that Kendra would be fired or that her reputation would be harmed, so any emotional distress was unreasonable. But the question is whether a reasonable person in Kendra's situation would suffer emotional distress from Miller's course of conduct. This could come from a fear of being fired, but it could also come from the continuation of the behavior that led to the stalking injunction. Because there is sufficient evidence of the latter, we need not opine on whether the State introduced sufficient evidence of the former.

Miller or 'anything he was doing,'" that she felt "'bullied' and 'horrible' throughout the duration of the time that Miller was contacting her," and that "his prior unwelcome behavior toward [Kendra] had distressed her to such a degree" that she obtained a stalking injunction against him. *Miller*, 2021 UT App 88, ¶ 23.

¶ 116  The court of appeals correctly looked at evidence that was presented to support the other counts to conclude there was sufficient evidence to support the conviction. Although the jury found that this prior conduct did not constitute stalking, it remained relevant to understand Miller and Kendra's relationship, the history they shared, and, therefore, whether Miller knew or should have known his emails would cause a reasonable person in Kendra's position emotional distress. *See* UTAH CODE § 76-5-106.5(2) (2014). The court of appeals did not err when it recognized this and included this prior evidence in its recitation of evidence the jury could properly rely on to convict Miller.

*C. The Court of Appeals Did Not Err When It Concluded that a Reasonable Jury Could Conclude that an Existing Stalking Injunction Would Not Mitigate the Effect of Miller's Emails*

¶ 117  Before the court of appeals, Miller argued that a reasonable jury could not find that Kendra suffered emotional distress because she had obtained a stalking injunction against Miller. Miller argued that this mitigated any emotional distress that Miller's communications to the attorney would have caused Kendra.

¶ 118  In front of us, Miller avers that the court of appeals erred when it rejected that argument. *See Miller*, 2021 UT App 88, ¶ 23.

¶ 119  A reasonable jury could conclude that the injunction did not mitigate the emotional distress. Rather than feeling protected by the injunction, Kendra testified that she "felt helpless" and "thought there was nothing anybody was going to ever do to ever stop [Miller]." A reasonable jury could infer that, in these circumstances, the stalking injunction did not eliminate the emotional distress Miller's behavior caused; behavior that had already motivated her to seek the injunction.

IV. MILLER ENGAGED IN A "COURSE OF CONDUCT"

¶ 120  Miller also argues that the court of appeals erred when it failed to address his argument that his actions did not constitute a "course of conduct" under the statute. He argues that his emails did not constitute the "two or more acts" required for a "course of conduct," because "the alleged actions must be distinct in time or

purpose." Miller claims that his emails, which were contained in one thread, were a singular event with one purpose.

¶ 121  Although the court of appeals characterized his actions as a "course of conduct," it did not explicitly address Miller's contention that the emails he sent did not meet the statutory definition. Any failure to address that argument is harmless, however, because there was ample evidence that Miller engaged in a course of conduct.

¶ 122  Stalking requires that the defendant engage in a course of conduct. UTAH CODE § 76-5-106.5(2) (2014).[10] The statute defines "course of conduct" as

> (b) [T]wo or more acts directed at or toward a specific person, including:
>
>   (i) acts in which the actor follows, monitors, observes, photographs, surveils, threatens, or communicates to or about a person, or interferes with a person's property:
>
>     (A) directly, indirectly, or through any third party; and
>
>     (B) by any action, method, device, or means; or
>
>   (ii) when the actor engages in any of the following acts or causes someone else to engage in any of these acts:
>
>     (A) approaches or confronts a person;
>
>     (B) appears at the person's workplace or contacts the person's employer or coworkers;
>
>     . . . .
>
>     (D) sends material by any means to the person or for the purpose of obtaining or disseminating information about or communicating with the person to a member of the person's family or household,

---

[10] Alternatively, stalking can require that the defendant violate a pre-existing stalking injunction. UTAH CODE § 76-5-106.5(3) (2014). This opinion does not address Miller's guilt under that theory. *See supra* ¶ 63 n.6.

employer, coworker, friend, or associate of the person;
[or]

. . . .

(F) uses a computer, the Internet, text messaging, or any other electronic means to commit an act that is a part of the course of conduct.

UTAH CODE § 76-5-106.5(1)(b) (2014).

¶ 123 Miller argues his emails did not constitute a course of conduct but were instead "all part of a single email chain conversation and related to the same topic of the settlement agreement." Miller claims that "[b]ecause the email chain in this case consisted of one back-and-forth conversation," Miller sending the emails cannot "constitute[] two or more acts," and therefore cannot be a "course of conduct." Miller correctly states that the court of appeals "implicitly held that the email chain constituted two or more acts."[11]

¶ 124 Miller supports this argument with the court of appeals' decision in *Hardy v. Hardy*, 2020 UT App 88, 467 P.3d 931.[12] Hardy's

---

[11] Miller also claims that the court of appeals erred when it described a course of conduct in which "Miller both communicated about [Kendra] indirectly or through a third party and disseminated information about [Kendra] to her employer, either of which may constitute a 'course of conduct' prohibited by the statute." *Miller*, 2021 UT App 88, ¶ 21. To the extent that the court of appeals meant Miller participated in a course of conduct because a single email communicated *and* disseminated information about Kendra, Miller is right. But we read the court of appeals' conclusion differently. The court seems to suggest Miller's emails constitute a course of conduct because there were two or more acts that communicated about Kendra *or* because the emails constituted two or more acts each of which disseminated information about Kendra.

[12] Miller also cites *Allen v. Anger* for the proposition that one incident "cannot constitute a course of conduct." (Quoting *Allen v. Anger*, 2011 UT App 19, ¶ 22, 248 P.3d 1001.) There, Anger distributed flyers that directed readers to a website that encouraged them to criticize Allen's parenting and facilitated this criticism by providing Allen's contact information. *Allen*, 2011 UT App 19, ¶ 4. The court of appeals, without analyzing the meaning of "single

(continued . . .)

ex-wife sought a civil stalking injunction against him after he photographed her taking their child to a therapist he did not approve of. *Id.* ¶¶ 2–3. Even though Hardy only took photographs on this single occasion, Hardy's ex-wife argued that this was a course of conduct because the statute lists both observing and photographing as acts that constitute stalking. *Id.* ¶ 8. The district court granted the stalking injunction, and Hardy appealed. *Id.* ¶ 3.

¶ 125 The court of appeals reversed. It held that a man "observing and photographing [an individual] at the same time and for the same purpose was not sufficient to establish a course of conduct under the stalking statute." *Id.* ¶ 6. The court further reasoned that "actions must be distinct in time *or* purpose" to constitute a course of conduct. *Id.* ¶ 8 (emphasis added).

¶ 126  Using *Hardy's* logic, Miller argues that he did not engage in a course of conduct because all of his emails were sent as part of one email chain and all were sent for the same purpose. Miller may be right that all of the emails occurred in the same thread, but that does not convert each of his separate emails into a single act. Miller sent several emails over two weeks. Just because Miller kept replying to the same thread, rather than sending separate emails, does not mean he engaged in a single act. Simply stated, by sending several emails over the course of several days, Miller acted more than once.

## CONCLUSION

¶ 127  This court has jurisdiction. The court of appeals correctly analyzed the statute and did not err when it concluded that the evidence, when viewed in the light most favorable to the verdict, was sufficient to sustain Miller's conviction. The court of appeals properly reversed the district court's arrest of judgment. We affirm.

---

incident," held that this was "[a] single incident" and, therefore, not a course of conduct. *Id.* ¶ 22. But *Allen* is not binding precedent and was based on analysis of a now-defunct standard. *Id.* ¶ 21 (relying on *Salt Lake City v. Lopez*, 935 P.2d 1259, 1264 (Utah Ct. App. 1997), *superseded by statute*, UTAH CODE § 76–5–106.5(1)(d), *as recognized in Baird v. Baird*, 2014 UT 08, ¶¶ 33–39, 322 P.3d 728). Additionally, we were not asked to review that decision, and nothing in *Allen* convinces us to alter our conclusion that, in this case, multiple emails sent over the course of two weeks constitute more than one act.