**2021 UT App 88**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellant,
*v.*
GREGORY RYAN MILLER,
Appellee.

Opinion *
No. 20170349-CA
Filed August 12, 2021

Third District Court, West Jordan Department
The Honorable Bruce C. Lubeck
The Honorable A. Chelsea Koch
No. 151400888

Simarjit S. Gill and Breanne M. Miller, Attorneys
for Appellant

Nathalie S. Skibine, Attorney for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

---

* The content of this opinion is identical to our prior opinion, 2019 UT App 46, which reversed the district court's order arresting judgment and reinstated the jury's verdict. That opinion was vacated by the Utah Supreme Court for lack of appellate jurisdiction because no final judgment had been entered by the district court. The supreme court remanded to this court with instructions to remand to the district court for entry of a final order in accordance with rule 4(c) of the Utah Rules of Appellate Procedure. On May 4, 2020, a newly-assigned district court judge entered a final judgment, perfecting our jurisdiction. *See* Utah R. App. P. 4(c) ("A notice of appeal filed after the announcement of a decision, judgment, or order but

(continued…)

HAGEN, Judge:

¶1 A jury convicted Miller of one count of stalking based on evidence that Gregory Ryan Miller sent emails disparaging the victim (K.B.) to her employer (the company). After the jury delivered its verdict, Miller filed a motion to arrest judgment. The district court granted the motion, determining that no reasonable jury could find that Miller (1) intentionally or knowingly engaged in a course of conduct directed at K.B. and (2) knew or should have known that the course of conduct would cause a reasonable person fear or emotional distress because Miller did not know that K.B. would read the emails. *See* Utah Code Ann. § 76-5-106.5(2) (LexisNexis 2014). The State appeals. We conclude that the State was not required to present evidence that Miller knew or should have known that his emails to the company would reach K.B. to prove beyond a reasonable doubt that Miller's conduct amounted to stalking. We therefore reverse and remand to reinstate the jury's verdict.

---

(…continued)

before entry of the judgment or order shall be treated as filed after such entry and on the day thereof."). Although Miller argues that the entry of the final judgment did not perfect our jurisdiction, we are bound to follow the supreme court's order, which expressly contemplated "the issuance of a decision on appeal following the entry of a final order in the district court." After receiving the remand disposition, this court invited the parties to file supplemental briefs, and the case was resubmitted for decision. Because the final judgment did not contain any additional rationale to support the original judge's ruling, our analysis remains the same.

## BACKGROUND[1]

¶2 Miller and K.B. met in 2003 or 2004 while working at the same accounting firm, and there were "periods of time" that they were "close friends." In 2011, K.B. found herself underemployed and Miller assisted her in obtaining a higher paying job with the company, a security system provider, where Miller was also employed. Miller held the position of financial controller and K.B. was hired as a bookkeeper.

¶3 In August 2012, Miller came across an invoice billed by a law firm for research conducted on the rights of convicted felons to have ownership interests in security system companies in the several states in which the company operated. The invoice identified the felon in question as the chief executive officer and one of the owners of the company.[2] Based on his own research, Miller concluded that the owner was illegally operating in the industry. Around this time, Miller and K.B.'s friendship began to deteriorate, which K.B. attributed to her refusal to be involved in Miller's plan to blackmail the owner.

¶4 Without K.B.'s support, Miller eventually confronted the owner about his criminal past and Miller's employment at the company was terminated the following day. After the company terminated his employment, Miller entered into negotiations with the company regarding his severance package. But according to Miller's testimony, the negotiations came to a

---

1. "We recite the facts in the light most favorable to the jury's verdict, and we present conflicting evidence as necessary to understand issues raised on appeal." *State v. Black*, 2015 UT App 30, ¶ 2, 344 P.3d 644.

2. At the time of trial, this owner no longer possessed an ownership interest in the company.

sudden halt after Miller learned that K.B. had provided the company's attorney with damaging information regarding Miller.

¶5 Following his termination, K.B. notified Miller that she no longer wished to remain in contact with him. Nevertheless, Miller continued to call her cell phone, call her work phone, email her, and text her about work and her personal life. Such communications included a suggestion that she find new employment as he intended to notify authorities that the company was illegally operating in the industry, accusations that K.B. was a traitor, requests that K.B. provide him a good work reference, racial slurs about K.B.'s boyfriend, and requests to meet her boyfriend. K.B. asked Miller to stop contacting her.

¶6 Despite her requests, Miller continued to contact K.B. by phone and email and would appear in public places that K.B. typically frequented. K.B. notified the police and in August 2013, she obtained a civil stalking injunction against Miller. The injunction stated, in relevant part:

> Do not stalk [K.B.]. This means you must not follow, threaten, annoy, harass, or cause distress to [K.B.]. For a legal definition of stalking, see Utah Code, sections 76-5-106.5 and 77-3a-101.
>
> Do not contact, phone, mail, e-mail, or communicate in any way with [K.B.] and any person listed below, either directly or indirectly.
>
> Other people you must not contact: K.B., [and K.B.'s daughters].

After the court issued the injunction, Miller ceased calling, texting, or emailing K.B.

¶7    In the meantime, Miller and the company were engaged in a civil lawsuit, to which K.B. was not a party. After the company and Miller eventually reached a settlement, Miller later contacted the company's attorney via email. This resulted in an exchange of emails between Miller and the company's attorney that took place between August 11, 2014, and August 25, 2014.

¶8    In the initial email, Miller notified the attorney that he intended to file "grievances" against the Utah Division of Occupational and Professional Licensing with the Utah Attorney General and the FBI. Miller stated that he had a job interview with one of the company's competitors and that he intended to work with Utah legislators to "improve Utah's regulation of companies trafficking in sensitive consumer information." The company's attorney replied that Miller was ignoring key provisions of the settlement agreement and the company would consider any of the actions Miller had described to be a material breach of the agreement.

¶9    In the next email, Miller accused K.B. and the owner of fabricating the stalking charges against him and suggested that the owner was using K.B.'s stalking allegations to take revenge on Miller. The company's attorney responded that he would not speak with Miller any further about the settlement. Miller then responded, proposing new settlement terms, which included a provision stating:

> Gregory Ryan Miller . . . [e]nters into a formal agreement with [the company] to refrain from pressing criminal charges or bringing civil actions against any related party, including [the owner] and [K.B.], for actions and statements alleged to have occurred prior to the date of the signing of said formal agreement.

¶10    The company rejected Miller's offer. Miller next proposed that the company re-employ him in the capacity of "Strategic

Consultant." In addition to requesting generous compensation, Miller also proposed that:

> [The company] pays to $zero balances the existing delinquent federal and state tax liabilities of [K.B.];
>
> [The company] establishes a fund for $25,000.00 to reimburse the tuition and other post-secondary educational expenses of [K.B.'s daughter].

¶11 The company also rejected this offer. In response, Miller again suggested that the owner was using K.B. to harm Miller's career and reputation. The company's attorney responded that the company would not accept additional settlement terms, stating that the company had no reason to believe Miller would abide by a new settlement when he had disregarded the first. In his reply, Miller listed the reasons why he would abide by his proposed terms, including the following:

> [B]efore me is a once-in-a-lifetime and priceless opportunity to repay evil with good. In my estimation [K.B.] has been treacherous, ungrateful, thoughtless and vicious. She has caused tremendous harm to me and mine, such that instinct and worldly wisdom tell me to hate and humiliate her. But who would gain from this? Instead, it is my hope that to give up some of my advantage in order to ease her burden would serve to brighten her outlook, soften her disposition and perhaps even help her to escape the cycle of futility, despair and vice that has plagued her for many years.

¶12 Because these email conversations conveyed Miller's settlement offers, the company's attorney forwarded them to the owner and to the company's general counsel. The company's attorney did not forward the emails to K.B., but the owner

frequently mentioned Miller at work due to the ongoing civil litigation between the company and Miller. At the company, K.B. saw the emails in which Miller requested that the company pay money to her and her daughter and referred to her actions as "evil," and she testified that the knowledge that Miller had involved her in his litigation with the company caused her to fear for her job and prevented her from concentrating on her work. It made her feel anxious, horrible, and worried.

¶13   Upon K.B.'s request, the company's attorney forwarded redacted copies of the emails to the police. Subsequently, the State charged Miller with three counts of stalking, all class A misdemeanors. *See* Utah Code Ann. § 76-5-106.5(6) (LexisNexis 2014). Count I alleged stalking that occurred prior to K.B.'s injunction against him, Count 2 alleged an incident of stalking that occurred after the injunction, and Count 3 alleged stalking as a result of Miller's email correspondence with the company's attorney. Following trial, the jury acquitted Miller on Count 1 and Count 2 but found Miller guilty on Count 3.

¶14   Prior to sentencing, Miller filed a motion to arrest judgment. *See* Utah R. Crim. P. 23. The district court granted Miller's motion after concluding that "the way [Miller's emails were] structured through the attorney . . . there is just no reasonable basis on which to believe [Miller] could think . . . or intend that that was going to cause [K.B.] or did cause her emotional distress or any fear." The State appeals.

ISSUE AND STANDARD OF REVIEW

¶15   The State argues that the district court erred in granting Miller's motion to arrest judgment for his stalking conviction. Under rule 23 of the Utah Rules of Criminal Procedure, a district court "upon its own initiative may, or upon motion of a defendant shall, arrest judgment if the facts proved or admitted do not constitute a public offense." We review a district court's

application of rule 23 for correctness. *State v. Black*, 2015 UT App 30, ¶ 11, 344 P.3d 644.


ANALYSIS

¶16    In granting Miller's motion to arrest judgment for his stalking conviction, the district court concluded that Miller's actions could not "reasonably be construed to be designed to cause emotional stress," that the evidence the State presented at trial failed to prove beyond a reasonable doubt that Miller intended "to cause [K.B.] or did cause [K.B.] emotional stress or any fear," and that, as a result, Miller's conduct did not constitute a "public offense."

¶17    Under the standard for determining whether an order arresting judgment is erroneous, which is the same as that for determining whether a jury verdict should be set aside for insufficient evidence, "a trial court may arrest a jury verdict when the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *State v. Workman*, 852 P.2d 981, 984 (Utah 1993).Viewing the evidence and all reasonable inferences that may be fairly drawn therefrom in the light most favorable to the jury's verdict, *see id.*, we conclude that there was sufficient evidence to prove the elements of stalking beyond a reasonable doubt.

¶18    Miller argues that under the stalking statute, the State was required to prove beyond a reasonable doubt that the he knew or should have known that his email correspondence with the company's attorney would reach K.B. and that the evidence presented at trial was insufficient on this point. This argument presumes that the only way to prove that Miller knew or should have known that his emails would cause a reasonable person to suffer emotional distress is by establishing that he knew or

should have known that the emails would be relayed to K.B. We disagree that such evidence is required to prove the elements of stalking beyond a reasonable doubt.

¶19 A person is guilty of stalking when that person "(1) intentionally or knowingly engages in a course of conduct directed at a specific person and (2) knows or should know that the course of conduct would cause a reasonable person" to either "fear for the person's own safety or the safety of a third person" or "to suffer other emotional distress." Utah Code Ann. § 76-5-106.5(2) (LexisNexis 2014).[3] Under section 76-5-106.5(1), "course of conduct" means "two or more acts directed at or toward a specific person, including:"

> (i) acts in which the actor follows, monitors, observes, photographs, surveils, threatens, or communicates to *or about* a person, or interferes with a person's property:
>
>> (A) directly, indirectly, or through any third party; and
>>
>> (B) by any action, method, device, or means; or

---

3. Under this section, a person is also guilty of stalking if he violates a stalking injunction. *See* Utah Code Ann. § 76-5-106.5(3) (LexisNexis 2014). As an alternative theory of Miller's guilt, the State presented evidence at trial and argues on appeal that Miller's conduct violated the civil stalking injunction protecting K.B. and her daughters from Miller. Because we conclude that Miller's conduct violated section 76-5-106.5(2), we do not separately analyze the sufficiency of the evidence supporting this alternative theory.

(ii) when the actor engages in any of the following acts or causes someone else to engage in any of these acts:

. . .

(B) appears at the person's workplace or *contacts the person's employer or coworkers;*

. . .

(D) sends material by any means to the person or for the purpose of obtaining or *disseminating information about* or communicating with *the person to a member of the person's family or household, employer, coworker, friend, or associate of the person; . . . .*

*Id.* § 76-5-106.5(1)(b) (emphasis added).

¶20 Contacting a person's employer or co-workers about the person is conduct included in the definition of stalking. Subsection (i) includes acts in which the perpetrator "communicates . . . about a person . . . indirectly, or through any third party." *Id.* § 76-5-106.5(1)(b)(i). Similarly, subsection (ii) includes acts of "contacting the person's employer or coworkers" and "disseminating information about . . . the person to . . . the person's . . . employer [or] coworker." *Id.* § 76-5-106.5(1)(b)(ii). The statute does not require that the perpetrator intend for his message to reach the victim through the victim's employer or co-workers. *Cf. State v. Trujillo*, 2019 UT 5, ¶¶ 20–23 (holding that the crime of witness retaliation requires that the defendant intend for the victim to hear the threat because the threat must be made "as retaliation or retribution" against a witness)

¶21 Miller's "course of conduct" in this case falls squarely within these statutory definitions. Miller sent emails to an

attorney representing K.B.'s employer. A reasonable jury could infer that Miller expected the company's attorney to forward his settlement proposals to the owner. Miller's statements about K.B. included suggesting that he had grounds to pursue criminal or civil charges against her; that she had "existing delinquent federal and state tax liabilities"; and that K.B. was "treacherous, ungrateful, thoughtless and vicious" and had caused harm to Miller. Through these emails, Miller both communicated about K.B. indirectly or through a third party and disseminated information about K.B. to her employer, either of which may constitute a "course of conduct" prohibited by the statute.

¶22 To be sure, the State must still prove that Miller knew or should have known that such a course of conduct would cause a reasonable person to suffer emotional distress. But a jury could reasonably find this element satisfied even if Miller had no reason to know that the emails would be relayed to K.B. Under section 76-5-106.5, "'[e]motional distress' means significant mental or psychological suffering, whether or not medical or other professional treatment or counseling is required," and "'[r]easonable person' means a reasonable person in the victim's circumstances." Utah Code. Ann. § 76-5-106.5(1)(d)–(e). The Model Stalking Code, on which Utah's statute is based, *see Baird v. Baird*, 2014 UT 08, ¶ 24, 322 P.3d 728, recognizes that "certain types of stalking behavior committed as part of a course of conduct, such as making repeated telephone calls to a victim at a workplace, possibly endangering her job, or engaging in conduct that destroys the victim's credit history, depending on the context, might not meet the 'fear for safety' standard" but still inflict "emotional distress." National Center for Victims of Crime, The Model Stalking Code Revisited: Responding to the New Realities of Stalking 40 (2007), https://victimsofcrime.org/docs/default-source/src/model-stalking-code.pdf?sfvrsn=12 [https://perma.cc/Z5DS-2GAT]; *see also State v. Askham*, 86 P.3d 1224, 1230 (Wash. Ct. App. 2004) (concluding that "a course of conduct designed to destroy [the victim's] life, both personally and

professionally" would cause substantial emotional distress to a reasonable person). Damage to one's reputation, relationships, or livelihood would cause a reasonable person to suffer emotional distress regardless of whether the communications that caused the damage are ever relayed to the victim.

¶23   Here, the State presented sufficient evidence from which a reasonable jury could find that, at the time that Miller sent the emails, he knew or should have known that a reasonable person in K.B.'s circumstances would suffer significant mental or psychological suffering. K.B. testified that she "wanted nothing to do with" Miller or "anything he was doing" and that Miller's emails to her employer's attorney made her feel afraid that she was going to lose her job. She added that she felt anxious because she knew people at her place of employment were talking about her and that she felt "bullied" and "horrible" throughout the duration of the time that Miller was contacting her and the company's attorney after he was fired. At the time Miller sent the emails, he knew that his prior unwelcome behavior toward K.B. had distressed her to such a degree that she had reported Miller's conduct to the police and obtained a civil stalking injunction against him. Miller received a copy of that injunction, which not only prohibited him from directly or indirectly contacting K.B., but also warned him not to "follow, threaten, annoy, harass, or cause distress" to K.B. and referred him to the statutory definition of "stalking," which includes contacting a person's employer or co-workers about the person. Because Miller was aware that K.B. no longer wanted to be involved with him, the jury could reasonably infer that Miller knew or should have known that disparaging K.B. to her employer and attempting to embroil her in his legal conflict and settlement negotiations would have caused a reasonable person in K.B.'s circumstances to suffer emotional distress.

CONCLUSION

¶24    It is immaterial whether Miller knew or should have known that the emails would be disclosed to K.B. The question for the jury was whether Miller knew or should have known that his course of conduct—spreading damaging information about K.B. to her employer after K.B. requested that he leave her alone—would cause a reasonable person in K.B.'s circumstances to suffer emotional distress. Based on the evidence, the jury could reasonably infer that Miller's emails were designed to damage K.B.'s reputation and endanger her job and that Miller knew or should have known that such interference would cause a reasonable person, who had repeatedly requested that Miller leave her alone and had received a stalking injunction against him, to suffer emotional distress. Therefore, we reverse the court's order arresting judgment, reinstate the jury's verdict, and remand for further proceedings consistent with this opinion.

————————