2023 UT App 147

## THE UTAH COURT OF APPEALS

TIMOTHY RICHINS,
Appellee,
*v.*
MARK WELDON,
Appellant.

Opinion
No. 20220522-CA
Filed December 7, 2023

Fourth District Court, Spanish Fork Department
The Honorable Jared Eldridge
No. 210300134

Walter A. Romney Jr. and Trenton L. Lowe,
Attorneys for Appellant

Chris A. Dexter, Attorney for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

MORTENSEN, Judge:

¶1　Mark Weldon admits he doesn't like Timothy Richins. But they had to deal with each other because Weldon managed the building in which Richins's employer is located. Richins filed a petition for a stalking injunction after becoming aware of direct and indirect communications Weldon had allegedly made concerning Richins. After being served with a temporary stalking injunction, Weldon requested a hearing. At the conclusion of that hearing, the district court made the injunction permanent. Now Weldon appeals, claiming that the evidence presented was insufficient to support the injunction and that the district court erroneously applied the facts to the law. We reject Weldon's arguments and affirm the district court.

BACKGROUND

*Petition and Temporary Civil Stalking Injunction*

¶2 Richins was a vice president at a company (Company), and his duties included facility management and ensuring that lease obligations were being fulfilled. In this capacity, he had known Weldon since November 2020. Weldon is the manager of the business that leased an office building to the Company. The Company leased space on the second floor and shared the first-floor server room with another tenant. According to Richins, the primary communications between him and Weldon were "discussions about the warehouse that was in current construction that [the Company was] going to . . . lease or move into once that construction was completed" and "any type of office facilities requirement, because it was a full-service lease." At the time of the events giving rise to this appeal, Weldon and the business he managed were "involved in civil disputes with [the Company] regarding the lease and other disputes."

¶3 Richins filed a request for a civil stalking injunction against Weldon in September 2021. In his civil stalking petition, Richins alleged that Weldon had "become increasingly hostile" and engaged in the following actions:

1. "On April 15, 2021, Mr. Weldon texted Mr. Richins at home and threatened to have him arrested and told [Richins] he was going to come see him personally."

2. "On July 8, 2021, Mr. Weldon sent a harassing email calling Mr. Richins by various names and calling him a liar."

3. "On July 8, 2021, Mr. Weldon sent an email with an implied threat that he 'will be at the

warehouse and he better not see any oil from a forklift.'"

4. "Additional emails were sent on July 8 and July 9, 2021 and again on July 27, 2021 harassing Mr. Richins and insulting him."

¶4     The petition also outlined various events that occurred on August 27, 2021—as detailed below—that ultimately prompted Richins to file a statement with the police and that became the focus of Richins's civil stalking injunction hearing.

¶5     The district court issued a temporary civil stalking injunction against Weldon. Soon thereafter, Weldon requested a hearing.

*Evidentiary Hearing to Determine Permanence of Injunction*

¶6     The district court held an evidentiary hearing to determine if the injunction would be modified, revoked, or continued. *See* Utah Code § 78B-7-701(5)(a). At the hearing, most of the testimony surrounded the events that occurred on August 27 at the Company's office building; unlike the events in April and July, Richins was not present for the August events and therefore had no personal knowledge of what occurred. Richins called six employees of the company as witnesses: a computer programmer (Programmer), a software engineer (Engineer), a software architect (Architect), the Company's CEO (CEO), an executive assistant (Assistant), and himself; Weldon called two witnesses: the property manager for the building (Manager) and himself.

A.     Programmer

¶7     Programmer was present on August 27 for a meeting (the first meeting) with Weldon, Manager, Engineer, and Architect in the first-floor server room. Programmer, Engineer, and Architect

were there to retrieve keys to the second-floor server room from Weldon and Manager and to transfer the servers there.

¶8 Programmer testified that when someone mentioned needing to get a key from Richins, Weldon expressed a lot of anger toward Richins, used "angry and aggressive language," swore, claimed that Richins "was doing wrong to him," said that "he wasn't going to let [Richins] get away with it," and stated that he was "watching" Richins and CEO.

¶9 After the first meeting, Programmer sent an email to Richins and CEO to notify them that Weldon had complained about Richins, "was verbally aggressive, [used] harsh language and repeatedly [dropped] F-bombs." The email explained that Weldon asked Architect "to tell" Richins that he was "an asshole." Programmer continued, "I don't remember at what point during his rant this was brought up, but he also said that he knows what [Richins] did in the warehouse and that he'll never get away with it. He said that he has private investigators following [Richins] and [CEO] and that he'll always be coming for them." Programmer understood this statement to mean that Weldon "would pursue legal recourse and other means if . . . deemed by him necessary until he got what he wanted." Programmer also expressed "concern" because Weldon "frankly . . . seemed a little unhinged and . . . unpredictable," stating that it made him fear for his safety at work.

¶10 Programmer further described a part of the first meeting where a screwdriver was needed to complete the task at hand. After the tool was located, Weldon informed Programmer that he would lend it to him but if Programmer "didn't give it back to him, [Weldon] was going to have to go out to his car, get in his trunk, grab a gun, and bring that gun upstairs and shoot somebody." When Programmer returned the screwdriver, Weldon said, "Good. Now I don't have to shoot anybody," which Programmer took as "an implied threat," largely directed against

Richins. Programmer explained that Weldon's anger "the entire time" was aimed at Richins. Moreover, Weldon's anger was unsolicited: "[H]e brought it up and kept going off on it." Programmer explained that "given the context," he understood the phrase "shoot somebody" to mean that Richins was the object of the threat. However, Programmer clarified that Weldon never directly said that he would shoot Richins.

¶11    Programmer revealed that he was "in fear" for himself and Richins after the first meeting. He told Richins "everything" he had included in the email and that he "thought" Weldon was "unstable" and the interaction was "scary." In response to Programmer's concerns, Richins explained that some of his past dealings with Weldon had been unpleasant and "scary to him."

B.    Engineer

¶12    Engineer also testified about the first meeting, including the screwdriver incident. Engineer expressed that the incident was "very odd" and "very uncomfortable" because Weldon, with whom Engineer had never interacted, was "threatening violence in a very . . . serious manner." Engineer clarified that Weldon's vitriol was directed at Richins. Weldon had called Richins "an effing tool," "an A-hole," and other "very similar things using similar vulgar language." Engineer said, "[W]eldon expressed his hatred of [Richins] very clearly. . . . It sounded pretty serious . . . . [H]e did not sound like he was joking." Engineer testified that the incident left him feeling "pretty nervous" and "scared."

¶13    After the first meeting, Engineer sent an email to Richins and CEO summarizing the encounter. Engineer wrote that Weldon was "spewing F-bombs," "telling us he's never going to stop going after" Richins and CEO, saying "that he has private investigators following" them, and stating that Richins "is a fucking asshole." Engineer's email also recounted the screwdriver threat, noting that (1) Weldon told him that if it was not returned, "he would go out to his car, grab his gun, and come upstairs and

have to shoot someone" and (2) after returning the screwdriver, Weldon responded, "Good. Now I don't have to shoot someone."

¶14 Engineer testified that he interpreted Weldon's statement about going after Richins and CEO to mean that he was "stalking and following them," intending to maybe do "harm to them in some way" or pursue legal remedies against them. Engineer interpreted these statements as threatening. Engineer noted in his testimony that Richins "remained upstairs" during the first meeting and that Weldon talked about shooting "someone" but did not specifically mention Richins.

C.    Architect

¶15 Architect also testified about the first meeting. He stated that upon hearing Richins's name, Weldon "became extremely angry" and "agitated." Architect testified that Weldon "started ranting" and saying, "[Richins] is an effing tool. I effing hate him. . . . I've been watching him. I know what he did. I'm never going to stop coming for him." Architect explained that he perceived Weldon's statements as "threats" that made him "very concerned" for his own safety and especially for Richins's safety. Architect was not privy to additional statements Weldon made because he "extricated" himself from the situation at that point. However, when he later recounted the first meeting to Richins, Architect indicated that Richins "seemed very uncomfortable" and "frightened."

D.    CEO

¶16 CEO testified about his interactions with Weldon at a separate meeting (the second meeting) that took place a few minutes after the first meeting on August 27. Weldon, Manager, CEO, and Assistant were present at this second meeting, which was called to discuss some misunderstandings regarding the ownership of various equipment. At some point during the second meeting, Weldon "mentioned that he was very upset with

. . . Richins," said that CEO should fire Richins, expressed that he "wanted to kill" Richins, and stated that since he was "going to die anyway, . . . he should take some people out with him."

¶17    After finding out the other things Weldon had said during the first meeting, CEO called the police. In his police statement, CEO explained that Weldon's words made him "immediately fearful" for Richins's safety, other employees' safety, and his own safety. CEO elaborated that during the second meeting, Weldon offered him some furniture for free and expressed his hope that their civil dispute would be settled "quickly and fairly." CEO felt that for Weldon "to threaten [Richins] and others generally to [CEO's] face," while asking for "a quick and fair settlement[,] came off as an effort to intimidate [them] into settling."

¶18    CEO explained that the situation "felt threatening . . . against [Richins] specifically" and that Richins was "visibly disturbed and worried" when CEO communicated the situation to him.

E.    Assistant

¶19    Assistant, who was present at the second meeting, testified that she became "uncomfortable" because "Weldon started saying things that [she] felt were threatening" toward Richins. Specifically, Assistant heard Weldon say that "he didn't want to die over the issues that they were having, but that he was willing to," and she said his tone sounded "kind of agitated." She also heard him say that "other people would die too before he did." She thought he was "serious," and she understood what he said "to be a threat." Assistant clarified that when Weldon referred to "other people" dying, he never specifically mentioned Richins's name, but she understood that "this was a threat of death" specific to Richins because Weldon was referring to Richins beforehand.

¶20    Assistant drafted an email to CEO stating these same views immediately following the second meeting. And when Assistant

told Richins about what Weldon said, Richins said that "he was concerned for his safety," that he "had put . . . more cameras up around his house," and that he "was afraid to come to work." She also testified that she knew Richins well enough to know that he was "in fear."

F.     Richins

¶21    Richins read the April 15 text exchange with Weldon into the record. In that exchange Weldon said, "[I]f you do not let [Manager] into my building that I own immediately, we will call the police. We will also . . . write out a report to the police and have you arrested." Richins responded, "I don't appreciate you threatening me . . . ." Then Weldon replied, "This a threat. It— what we have done already. You locked us out of our building. What is wrong with you? We have work to do at the building. . . . I will come see you personally when I'm back in Utah, and we need to talk about it."

¶22    Richins noted that this text exchange was the first "[d]ocumented incident" where he felt threatened by Weldon but stated he had "multiple interactions with . . . Weldon, and he is a very hostile person." Richins testified that he did not understand why Weldon was texting him at home "early in the morning" and "threatening to have [him] arrested" when he had not done "anything wrong." He explained that Weldon was "coming after [him] for no reason" and that he had "no control over this situation." And Richins saw the text as threatening: "[C]oming to see me personally is [a threat]. He could call me on the phone. He didn't need to come see me personally. [T]hat's an implied threat, [especially with] the context previous to this and the hostility previous to this."

¶23    Regarding the August 27 interactions and why he was not present at the meetings, Richins testified that he purposely "took [himself] out of that situation because of previous fear, and [he] didn't want to interact with [Manager] or [Weldon]." When

Richins first learned from Architect about the events surrounding the first meeting with Weldon, he testified that it made him feel "fearful" and "more scared." He said that he does not "want to go to work" and relies on "multiple locks" on his door for security. Moreover, he said,

> My wife doesn't want to leave her house. . . . [T]his has been the most terrifying thing I have ever gone through, and I am not making that up. I'm fearful to be doing this right now and what retaliation may come from this, and I never want to go through this again. And I am still scared. I am sorry, but this is hard, and it's hard on my family, and it's hard on me. And I'm just trying to be a professional that is trying to do his job, and I am being terrorized because of it.

¶24 Richins explained what he has done in response to the fear he has felt:

> I've installed a complete security system in my house. . . . [N]ow I have motion-activated cameras all the way around my house. I had somebody come and install a [reinforced] door frame, new locks . . . around my house. . . . I don't let my kids play outside anymore by themselves. They don't walk to school by themselves. My wife is in fear. We don't go out and do recreational things like we used to. We're afraid that we're being followed, because we've been told we're being followed and that people are coming after us, and I need somebody to protect me from . . . this.

¶25 Richins continued,

> I don't sleep well. I have bad anxiety. I fear every day I go to work. I carry a flashlight so I can look

underneath my vehicle when I go out . . . . I don't like working late at night. It has impeded my work. It has impeded my personal life. It has impeded my entire family so I can make an honest living, and that's wrong.

G.    Manager

¶26    Manager, who had known Weldon for about fifteen months, performed work directed by Weldon and was present at both meetings. Regarding the first meeting, he testified, "I don't know if [Weldon] called [Richins] an asshole or referred to him . . . as an asshole. I just remember 'asshole' and '[Richins]' in the same sentence," and that was "the only time" he remembered Weldon "talking about" Richins. Regarding the screwdriver incident, Manager testified that Weldon "looked around, found a screwdriver and made mention that the screwdriver needed to be replaced or that [another tenant] could come after us with a gun and shoot us." Manager believed this comment was directed at Weldon and himself and "perceived it as funny." He further testified that Weldon never said he would get a gun out of his car and shoot somebody.

¶27    Regarding the second meeting, Manager "vaguely recall[ed]" Weldon saying something about not wanting "to die over something, but he was willing to," but Manager said Weldon was "referring to stress" and his ability to "outlive everybody else, kind of like a cockroach would outlive Armageddon." Manager further testified that Weldon's statement was not directed at Richins and "was not a threat." Manager also testified that Weldon did not say he was going to kill Richins.

H.    Weldon

¶28    Weldon testified that the April 15 text message to Richins "certainly [was] not a threat."

¶29 With regard to the first meeting on August 27, Weldon testified that he was frustrated no one had a key or tools, and so he said, "[Richins] is acting like an asshole. Why aren't you prepared?" And regarding the screwdriver incident, he testified as follows:

> I said, "You can borrow these tools, but don't forget the rules of the universe. You take another man's tool, you don't put it back, they're going to come shoot us." Not me shoot [Richins]. Not me shoot anybody else. [The other tenant will] come shoot all of us, including me, so put the tool back, not only in the tool box but in the right way and method it came out. The Phillips-head goes back here. The flat-head goes back there. The pliers go back here. . . . And one of the fellows said, "Oh, don't let him shoot. Don't shoot me." And they were all joking and laughing.

¶30 When asked about whether he said he was going to kill Richins, he testified, "No, absolutely no. Absolutely not. That would be a felony, and I would never talk like that." He also testified that he did not "recall" claiming that he had a gun.

¶31 About making "any threat" against Richins, Weldon explained that he was merely telling Programmer, Engineer, and Architect that his attorneys were good and that they were "not going to stop" because the Company owed Weldon "a lot of money." And he clarified that when he said, "We'll always be coming [for] you," he meant that they were "going to go to every court possible."

¶32 About the second meeting, Weldon testified that he told CEO, "The stress is going to kill everybody, including me, including all of us." He claimed that he told CEO to "do the right thing" and settle the lawsuit.

¶33    Regarding Richins, Weldon said that he told CEO that there were "some issues with the way [Richins] handles himself." And Weldon admitted he "may have" told others that he "hate[d]" Richins and that Richins was "acting like an effing A-hole."

### *District Court's Ruling*

¶34    The district court ruled that "the key point here is whether or not there was a course of conduct," which the court explained required "two or more acts directed at or toward a specific person," citing Utah Code section 76-5-106.5. In that regard, the court agreed with Weldon that the April 15, 2021 incident did not rise "to the level of something" that would be considered "as part of a course of conduct for stalking" and concluded that "the only behavior that . . . could potentially satisfy the statute [occurred] on August 27."

¶35    At that point, the court parted ways with Weldon, finding that the two meetings on August 27 constituted two separate acts for purposes of the stalking statute. The court explained, "These [meetings] seem . . . to be two distinct events. They didn't happen simultaneously. They seem to be distinguished by both the parties that were involved in the events, as well as a separation of a short period of time. So, really, those are the two incidents . . . ."

¶36    The court then explained that the first incident was made up of two comments from the first meeting when Weldon went into a "tirade" at the mere mention of Richins's name. The first comment involved how Weldon was surveilling Richins and how he "would keep coming for him." The court found Weldon's explanation of this comment—that "he had attorneys that were hired, and he didn't really know what the attorneys were doing, and maybe they had hired private investigators, [that he] didn't really know, that was up to the attorneys"—not credible. The court found that the second comment to make up the first incident was when Weldon said he would get his gun and shoot someone

if the screwdriver was not returned properly. And although Weldon did not identify who "someone" was, the court found that "from the context of the conversation, it appears to be pretty clear that Mr. Richins was upstairs, and that . . . comment was likely directed toward Mr. Richins."

¶37    Next, the district court found that the second incident occurred when Weldon told CEO that he was going to kill Richins. Despite the fact that Assistant did not hear those exact words, the court found her testimony that she heard Weldon say he was going to die but would first take others out and her testimony that she interpreted those words to be directed toward Richins as supportive of CEO's testimony.

¶38    Referring to the statements from both meetings cumulatively, the court also found that "Weldon made those statements either intentionally or knowingly, and [they were] directed toward a specific person, although they were made to third parties." Additionally, after explaining that Utah Code section 76-5-106.5 required a showing "that the course of conduct would cause a reasonable person to fear for the person's own safety or to suffer other emotional distress," the court found that "those statements were concerning enough that Mr. Weldon should have known . . . that course of action would cause Mr. Richins extreme distress."

¶39    Concluding that the findings of fact supported the elements of stalking, the district court made the civil stalking injunction permanent.

*Events Following the Evidentiary Hearing*

¶40    Subsequently, Weldon filed two motions under rules 52 and 59 of the Utah Rules of Civil Procedure, arguing, in part, that the court's findings were inadequate, that insufficient evidence existed to support the injunction, and that, therefore, the findings should be struck and the entry of the permanent civil stalking

injunction should be dismissed with prejudice. These motions were denied, and Weldon appeals.

ISSUES AND STANDARDS OF REVIEW

¶41  All the issues Weldon raises focus on the district court's interpretation and application of the Utah stalking statutes. *See* Utah Code §§ 76-5-106.5, 78B-7-701. Weldon's initial set of issues surrounds the first element of stalking. In that regard, Weldon contends that the district court "erred in determining that [his] alleged conduct amounted to a 'course of conduct' under Utah law." "Whether someone has engaged in a course of conduct under the stalking statute is a question of law, which we review for correctness." *Hardy v. Hardy*, 2020 UT App 88, ¶ 4, 467 P.3d 931, *cert. denied*, 474 P.3d 948 (Utah 2020). Weldon further asserts that the court erred in determining that certain statements "were directed at or toward Richins to satisfy the civil stalking statute," which we also review for correctness. *See Ellison v. Stam*, 2006 UT App 150, ¶ 16, 136 P.3d 1242 ("The proper interpretation and application of a statute is a question of law which we review for correctness, affording no deference to the district court's legal conclusions." (cleaned up)).

¶42  Weldon also takes issue with the district court's handling of the second element of stalking—that the respondent knew or should have known that his course of conduct would cause a reasonable person in the petitioner's position to fear for his safety or suffer other emotional distress. Related to this element, Weldon first asserts that the district court "erred in determining that [he] made a death threat toward Richins." "We review challenges to findings of fact for clear error." *Henshaw v. Henshaw*, 2012 UT App 56, ¶ 10, 271 P.3d 837. Weldon also argues that the district court "erred in determining that [his] alleged conduct could cause a reasonable person to fear for his safety or suffer other emotional distress." "Although the question of whether the course of conduct would cause a reasonable person in a petitioner's

circumstances to suffer fear or emotional distress is a question of fact that we review for clear error, we review the district court's interpretation of the underlying legal standard for correctness." *Anderson v. Deem*, 2023 UT App 48, ¶ 22, 530 P.3d 945 (cleaned up).

ANALYSIS

¶43     Individuals who believe they are victims of "stalking may file a . . . petition for a civil stalking injunction against the alleged stalker with the district court." Utah Code § 78B-7-701(1)(a)(i). If the district court "determines that there is reason to believe that an offense of stalking has occurred," it may issue a temporary injunction based on the petition alone, restraining the person from behaviors such as coming near or contacting the petitioner. *Id.* § 78B-7-701(3)(a). The accused may then request an evidentiary hearing to dispute the injunction, and if this request is timely, "the burden is on the petitioner to show by a preponderance of the evidence that stalking . . . has occurred." *Id.* § 78B-7-701(4)(a), (b)(ii). Thus, Richins maintained the burden of proof in this case.

¶44     To satisfy this burden, Richins had to establish the two elements of stalking, which are (1) that a person "intentionally or knowingly" engaged "in a course of conduct directed at a specific person" and (2) that the person knew or should have known "that the course of conduct would cause a reasonable person to fear for the person's own safety or suffer other emotional distress." *Ragsdale v. Fishler*, 2021 UT 29, ¶ 25, 491 P.3d 835 (cleaned up). A petitioner must prove both elements for a district court to enjoin an alleged stalker's behavior after the hearing. *Id.*; *see also* Utah Code § 76-5-106.5(2)(a).

¶45     Here, the district court concluded that the evidence at the hearing supported a finding that stalking occurred and made the civil stalking injunction permanent. We agree with the district court and address each issue in turn.

## I. Course of Conduct Directed at a Specific Individual

### A.    Course of Conduct

¶46    The stalking statute defines a course of conduct as "two or more acts directed at or toward a specific individual." Utah Code § 76-5-106.5(1)(a)(i). These acts may include those where the "actor follows, monitors, observes, photographs, surveils, threatens, or communicates to or about an individual" and may be performed "directly, indirectly, or through any third party." *Id.* § 76-5-106.5(1)(a)(i)(A)(I). These acts also can include those where the actor "appears at the individual's workplace or contacts the individual's employer or coworker." *Id.* § 76-5-106.5(1)(a)(i)(B)(II).

¶47    "As the statute makes clear, a single isolated act cannot qualify as a course of conduct." *Butters v. Herbert*, 2012 UT App 329, ¶ 12, 291 P.3d 826. "When interpreting a statute, our primary goal is to ascertain the legislature's intent, the best evidence of which is the plain language of the statute itself. And when reading a statute's plain language, we presume the legislature used each term advisedly according to its ordinary and usually accepted meaning." *Ragsdale*, 2021 UT 29, ¶ 29 (cleaned up). Under the facts of this case, the district court concluded that two separate acts occurred on August 27 to make up a course of conduct as the statute requires.[1] The court found that the first act occurred at the

---

1. The district court also concluded, "I don't think that the April incident really rises to the level of something that I would consider as part of a course of conduct." The April 15 incident, however, most likely could have been considered an "act" for purposes of the statute. An act does not need to rise to any level of threat or concern to be considered an act. Our court explained in *Anderson v. Deem*, 2023 UT App 48, 530 P.3d 945, that while "acts might well be threatening, . . . they don't have to be." *Id.* ¶ 25. "As our supreme court has made clear, establishing a course

(continued…)

first meeting during the conversation among Programmer, Engineer, Architect, Weldon, and Manager and that the second act happened at the second meeting during a separate conversation among CEO, Assistant, Weldon, and Manager.

¶48   Regarding the first act, the court highlighted how the testimony of Programmer, Engineer, and Architect demonstrated "that the mention of [Richins's] name seemed to send Mr. Weldon . . . into a tirade." And the court noted that "during this tirade, Mr. Weldon made a comment that he was surveilling Mr. Richins and that he would be coming for him." Also, the court observed that Programmer and Engineer both testified how Weldon expressed that if they did not return a borrowed screwdriver, "he would go get a gun and that he would go upstairs and shoot someone."

¶49   The court found that the second act occurred after Programmer, Engineer, and Architect had gone back upstairs and CEO and Assistant had joined Weldon and Manager for the second meeting a few minutes later. This, the court found, was when CEO heard Weldon say he was going to kill Richins and when both CEO and Assistant heard Weldon say that "if he was going to die, he was going to take out others first."

¶50   The court concluded that the conversations that took place during the first and second meetings constituted a course of conduct because they were "two distinct events," they "didn't happen simultaneously," they seemed "to be distinguished by . . .

---

of conduct is the first step in the stalking analysis. This step should not be conflated or combined with the second part of the analysis, which involves a determination as to whether the course of conduct would cause a reasonable person fear or emotional distress." *Id.* ¶ 26 (cleaned up). To the extent that the district court did not consider the April 15 incident an act because it was not threatening in nature, the court erred in its interpretation of the stalking statute.

the parties that were involved in the events," and they appeared to be separated by "a short period of time."

¶51    Weldon argues that the district court erred in its conclusion that these separate conversations constituted a course of conduct because all the statements about which the witnesses testified were "made in the heat of the moment," "occurred in the same location . . . to a revolving cast of participants over a period of 13 to 19 minutes from start to finish," were separated by "a very brief pause," made up "one continuous episode," and therefore were not "distinct in time." Weldon cites *Hardy v. Hardy*, 2020 UT App 88, 467 P.3d 931, *cert. denied*, 474 P.3d 948 (Utah 2020), in support of his argument.

¶52    In *Hardy*, an ex-husband believed his ex-wife was taking their child to see a certain therapist in violation of their divorce decree. *Id.* ¶ 2. In response, the ex-husband went to the therapist's office, observed his ex-wife sitting in her vehicle, and photographed her. *Id.* In concluding that the ex-husband's acts of observing and photographing—two potential stalking behaviors—did not constitute two separate acts, the court explained that "[j]ust because observing and photographing are listed separately in the statute does not mean that they are distinct acts when they occur *simultaneously and where one is inherent in the other*." *Id.* ¶ 8 (emphasis added); *id.* (explaining that photographing "cannot be accomplished without some degree of . . . observing"). Because the district court here found that the two meetings were not simultaneous, *Hardy* is distinguishable, and Weldon's reliance upon *Hardy* fails.

¶53    Moreover, "we do not consider individual acts in a vacuum." *Butters v. Herbert*, 2012 UT App 329, ¶ 12, 291 P.3d 826. "Instead, when determining whether a person's acts constitute a course of conduct, our cases require that we consider the acts cumulatively in light of all the facts and circumstances." *Id.* (cleaned up). When doing so, "we consider the time elapsed

between individual incidents," while "also [bearing] in mind, however, that course of conduct is defined broadly and does not require that the actions that constitute a course of conduct be committed within a certain period of time" or that they be separated by a certain period of time. *Id.* ¶ 13 (cleaned up).

¶54    This principle is highlighted well in *Anderson v. Deem*, 2023 UT App 48, 530 P.3d 945, where the stalker sent the victim a series of Instagram messages, which included an apology followed by multiple messages over a period of three hours. *Id.* ¶ 7. Two messages—sent after the apology and minutes apart from each other—rescinded the apology and contained a litany of grievances. *Id.* ¶ 8. In the next two messages—sent some hours after the first two messages and minutes apart from each other—the stalker told the victim that he would be "waiting" for her in hell and then directed a common profanity at her. *Id.* ¶¶ 8–9. Our court explained that this "incident likely established a course of conduct" because, along with each message having a different purpose, "a single event with multiple distinct acts . . . separated by some amount of time might constitute a course of conduct." *Id.* ¶ 26 n.8 (cleaned up); *see also State v. Miller*, 2023 UT 3, ¶ 126, 527 P.3d 1087 (explaining that sending emails "in the same thread . . . does not convert each of [the] separate emails into a single act" when they were sent over multiple days); *State v. Kitches*, 2021 UT App 24, ¶ 50, 484 P.3d 415 (emphasizing that "although a single incident may not appear to be a qualifying act directed at the victim, an objective evaluation of all the circumstances—particularly the nature and timing of the acts—may indeed show that the incident was part and parcel of a broader course of conduct directed at the victim"), *cert. denied*, 496 P.3d 718 (Utah 2021).

¶55    Likewise, even if, for argument's sake, we agreed with Weldon that the two meetings make up one continuous episode, they were distinct in time. Considering "the acts cumulatively in light of all the facts and circumstances"—namely, that the acts

were not simultaneous, were separated by a period of time, were not each inherent in the other, and involved separate parties to separate conversations—we conclude that the district court correctly determined that the two conversations constituted two separate acts for purposes of establishing a course of conduct under the stalking statute. *Butters*, 2012 UT App 329, ¶ 12 (cleaned up).

B.     Directed at a Specific Individual

¶56    Weldon alleges that even if a course of conduct existed, neither of the conversations that took place in the meetings were "directed at or toward *a specific individual*," namely, Richins, as required by Utah Code section 76-5-106.5(1)(a)(i).

¶57    We first note that, to the extent Weldon asserts it is significant that Richins was not in the server room during these conversations, we agree with the district court that it is not relevant to our analysis. As the court observed, Utah Code section 76-5-106.5(1)(a)(i)(A)(I) allows the course of conduct to be performed "directly, indirectly, or through any third party." *See State v. Miller*, 2021 UT App 88, ¶ 20, 496 P.3d 282 (discussing that the "statute does not require that the perpetrator intend for his message to reach the victim through the victim's employer or co-workers"), *aff'd*, 2023 UT 3, 527 P.3d 1087; *Carson v. Barnes*, 2016 UT App 214, ¶¶ 16–17, 385 P.3d 744 (explaining that "the statute does not require the victim to be physically present for an act to be considered in the 'course of conduct'" and "[b]y the plain language of the statute, the threatening act need not be direct, and it includes situations in which the actor comes to the 'person's workplace' or 'contacts the person's . . . coworkers,' without requiring the presence of the victim"). "In other words, the person toward whom a respondent's behavior is 'directed at' . . . is determined by an objective assessment of whether the respondent engaged in conduct prohibited by the stalking statute. And this is true even where a respondent directs his or her conduct at a

petitioner 'indirectly or through a third party.'" *Ragsdale v. Fishler*, 2021 UT 29, ¶ 37, 491 P.3d 835.

¶58 Weldon alleges that because some of his threats did not name Richins specifically, they could not be directed at Richins. In support of this argument, Weldon highlights how Programmer and Engineer both testified that during the first conversation, Weldon stated that if they did not return the screwdriver, he was going to go upstairs and shoot "somebody" or "someone." And regarding the second conversation, Weldon points out how both CEO and Assistant testified that Weldon said because he was going to die anyway, he should take out "other people" or "some people" first.

¶59 Our court has explained that, just as with determining whether a course of conduct exists, it is appropriate "to analyze the entire course of conduct between the parties," i.e., consider the course of conduct "cumulatively in light of all of the facts and circumstances of the case," "in determining whether [the alleged stalker's] conduct was 'directed at' [the petitioner]." *Ellison v. Stam*, 2006 UT App 150, ¶ 38, 136 P.3d 1242. One significant aspect of the facts and circumstances Weldon fails to mention is that the district court found that during both conversations, Weldon directed a threat specifically toward Richins in addition to these more general threats. For example, the district court found that during the first conversation "Weldon made a comment that he was surveilling Mr. Richins and that he would keep coming for him." The district court also found that during the second conversation, Weldon threatened to kill Richins by name.

¶60 Furthermore, the witnesses also testified regarding disturbing language and statements that Weldon directed toward Richins during both conversations. For example, Programmer testified that Weldon directed "angry and aggressive language," including swearing, toward Richins, "saying things that he claimed [Richins] was doing wrong to him and that he wasn't

going to let him get away with it." Similarly, Engineer testified that Weldon called Richins "an effing tool" and "an A-hole," said other "similar things using similar vulgar language, typically directed at [Richins]," and "expressed his hatred of [Richins] very clearly." Likewise, Architect testified that Weldon "became extremely angry . . . [and] agitated" when he heard Richins's name and "started ranting" about Richins, saying that Richins was "an effing tool" and that he "effing hate[d] him." And in light of this testimony, the district court found that "it appears to be pretty clear that Mr. Richins was upstairs, and [the comment about somebody was going to be shot] was likely directed toward Mr. Richins."

¶61   Finally, the witnesses testified that, despite Weldon's general references to "other people," "somebody," or "some people," they understood these threats to be directed toward Richins. For example, Assistant clarified that even though Weldon never specifically mentioned Richins's name in reference to people dying, she understood that there was "a threat of death" toward Richins because Weldon was referring to Richins beforehand. And regarding this statement, the district court expressed that given Assistant's "interpretation of that conversation, based on the context and the other comments that were made," it "was expressed and directed toward Mr. Richins."

¶62   Programmer also interpreted these statements as a threat against Richins because of "the anger" that Weldon had expressed "the entire time" they were with him. Programmer testified that Weldon's comments about Richins were unsolicited: "[N]o one was asking about this. . . . [Weldon] brought it up and kept going off on it." Programmer said that "the implication of 'shoot somebody'" was that Weldon meant Richins. Also, when asked if he was concerned about anyone else's safety besides his own in light of the circumstances, Architect replied, "Yes. Particularly [Richins] . . . ."

¶63 Therefore, taking all these circumstances into consideration, namely, the threats specifically directed at Richins, the disturbing language about Richins, and the witnesses' interpretation that the indirect threats were aimed at Richins, we agree with the district court that the conversations as a whole were directed at Richins.

## II. Reasonable Person Fearing for Own Safety or Suffering Emotional Distress

### A. Weldon's Threat to Kill Richins

¶64 As an initial matter, we address Weldon's contention that the district court erred in finding that Weldon threatened to kill Richins. "In all actions tried upon the facts without a jury . . . , the court must find the facts specially and state separately its conclusions of law." Utah R. Civ. P. 52(a)(1). "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the credibility of the witnesses." *Id.* R. 52(a)(4). "A trial court's factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if this court has a definite and firm conviction that a mistake has been made." *Henshaw v. Henshaw*, 2012 UT App 56, ¶ 10, 271 P.3d 837 (cleaned up). Therefore, "we give great deference to the trial court and do not lightly disturb its factual findings." *Id.* (cleaned up).

¶65 The court based its finding that Weldon threatened to kill Richins on the evidence before it and by determining that Weldon lacked credibility. For example, CEO testified that Weldon "mentioned that he was very upset" with Richins, that CEO "should fire" Richins, and that Weldon "wanted to kill" Richins. The district court found CEO's testimony to be credible. And the district court already had questioned Weldon's credibility as a witness when Weldon denied saying that he was surveilling Richins and instead testified that he said his attorneys might have

hired private investigators to surveil Richins. In response, the court stated that it was "not really persuaded that that's the conversation that took place."

> [T]rial courts are often faced with the necessity of making factual findings based exclusively on oral testimony. Moreover, trial courts have the benefit of viewing the witnesses firsthand, to assess their demeanor and to consider their testimonies in the context of the proceedings as a whole, making them much better equipped to make credibility determinations based on conflicting oral evidence than an appellate court that has access only to the cold record.

*Id.* ¶ 12. Here, the district court assessed Weldon's and CEO's demeanors and considered their testimonies in the context of the proceedings as a whole. And in the face of their conflicting testimonies, the court found CEO to be the more credible witness. Weldon has thus failed to show that the district court's finding was clearly erroneous.

B.      Emotional Distress

¶66     Weldon alleges that the district court "only tied its emotional distress ruling to the surveillance comment"[2] and "did

---

2. Weldon seems to be referring to the district court's statement, "I think the evidence I have is that Mr. Richins, in fact, has experienced extreme distress, that he's taken steps to protect himself and his family, including the installation of surveillance equipment on his house and limiting their public presence and taking other actions." "Under the second stalking element, a petitioner must show that the respondent knew or should have known his or her conduct would cause *a reasonable person* to fear for the petitioner's own safety or suffer other emotional distress."

(continued…)

not address any emotional distress caused by the screwdriver comment, which made up the court's 'first incident,' or by the purported 'death threat' or 'taking others out' comment, which made up the court's 'second incident.'" We understand this argument to mean that the district court should have decided whether a reasonable person would suffer fear or emotional distress for each act that makes up a course of conduct, separately from each other. But this argument misconstrues the law, as this court has held that a district court should not consider each act "in isolation." *Anderson v. Deem*, 2023 UT App 48, ¶ 27, 530 P.3d 945. Instead, "a district court should consider the course of conduct cumulatively." *Id.* ¶ 28. If the court had looked at each aspect of each conversation separately, then it might have found that each aspect of the conversation in isolation would not have caused a reasonable person to feel fear or emotional distress. *See id.* ¶ 31 ("[W]hile the profanity alone might not be enough to cause fear or emotional distress, when considered in conjunction with [the respondent's] wish to see [the petitioner] in hell and his earlier communication that she was a 'bitch' that he would like to see 'die,' a different picture emerges."). The district court's conclusion here, "that *those statements* were concerning enough that Mr. Weldon should have known . . . that course of action would cause Mr. Richins extreme distress," indicates that the court correctly analyzed all of Weldon's statements throughout both

---

*Ragsdale v. Fishler*, 2021 UT 29, ¶ 45, 491 P.3d 835 (emphasis added) (cleaned up). This is an objective standard under which the subjective effect of the respondent's conduct on the petitioner is not the relevant question. *See id.* Thus, whether Richins actually experienced extreme distress is not relevant to our analysis, and the district court should not have implied that it was. As our analysis demonstrates, however, the court ultimately based its decision on a reasonable person standard.

conversations cumulatively in deciding this element of stalking. (Emphasis added.)[3]

¶67    Furthermore, the *Anderson* court elaborated that under the stalking statute, a "petitioner must establish . . . that the respondent's conduct would cause emotional distress to a reasonable person in the petitioner's circumstances." *Id.* ¶ 29 (cleaned up). And by "including 'in the victim's circumstances' as part of the 'reasonable person' definition, the statute provides for an individualized objective standard, meaning that a court must consider the entire context surrounding the defendant's conduct." *Id.* (cleaned up). "Courts applying this individualized objective standard have considered such factors as the victim's background, the victim's knowledge of and relationship with the defendant, any history of abuse between the parties, the location of the alleged stalking," and "the cumulative effect of [the] defendant's repetitive conduct." *Baird v. Baird*, 2014 UT 8, ¶ 27, 322 P.3d 728 (cleaned up). Another consideration could be whether the behavior "might cause damage to one's reputation, relationships, or livelihood." *State v. Miller*, 2023 UT 3, ¶ 84, 527 P.3d 1087 (cleaned up). In other words, to "properly apply the stalking statute's objective standard," a district court should analyze a defendant's "conduct in light of the specific facts and circumstances of [the petitioner's] individual case." *Ragsdale v. Fishler*, 2021 UT 29, ¶ 48, 491 P.3d 835.

---

3. We acknowledge that it would have been better for the court to have said "a reasonable person in Richins's circumstances" rather than "Mr. Richins." That said, we interpret the district court to mean a reasonable person. Given the court's restatement of the law that the statute requires the course of conduct to "cause a reasonable person to fear for the person's own safety or to suffer other emotional distress," we are confident the court understood and applied the appropriate standard.

¶68 Here, the entire context includes more than just the two conversations that occurred on August 27. Weldon and Richins knew each other and had a contentious relationship since November 2020, as the text messages of April 15 and Richins's testimony demonstrated. And in his civil stalking petition, Richins included other interactions with Weldon that he alleged were "acts" under the stalking statute, such as emails that Weldon sent to Richins on July 8, July 9, and July 27.

¶69 Also significant was the location of the two August 27 conversations. Given the fact that Weldon was saying very negative things about Richins to his fellow employees and boss, including telling CEO that he should fire him, Weldon's behavior could have damaged Richins's work relationships and reputation as well as his livelihood. *See Miller*, 2023 UT 3, ¶¶ 84–86. Thus, ample evidence existed for the district court to conclude that a reasonable person in Richins's circumstances would feel emotional distress.

## CONCLUSION

¶70 In light of all the facts and circumstances in this case, the district court correctly concluded that Weldon intentionally or knowingly engaged in a course of conduct that was directed at Richins and that Weldon knew or should have known that such a course of conduct would cause a reasonable person in Richins's circumstances to fear for his own safety or suffer other emotional distress. Therefore, we affirm the district court in all respects.

———————